[Civ. No. 6096. Fifth Dist. Feb. 1, 1982.]

CHRISTOPHER G. MONEY, as District Attorney, etc., Petitioner and Respondent, v.
KEITH CLAYTON KRALL, Objector and Appellant.

[Crim. No. 5742. Fifth Dist. Feb. 1, 1982.]

In re KEITH CLAYTON KRALL on Habeas Corpus.

---

COUNSEL

Philip R. Clarkson, under appointment by the Court of Appeal, for Objector and Appellant and Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher, James Ching and Jana L. Tuton, Deputy Attorneys General, for Petitioner and Respondent.

---

## OPINION

HANSON (P. D.), J.—Appellant Keith Clayton Krall was civilly committed to the Department of Developmental Services on November 3, 1980, pursuant to a court finding that he was mentally retarded and dangerous to others. (Welf. & Inst. Code, § 6500 et seq.) At the hearing in superior court, appellant's counsel stipulated that appellant was dangerous to others but denied that appellant was mentally retarded within the meaning of the statutes. In this proceeding, appellant argues that Welfare and Institutions Code section 6500[1] is unconstitutionally vague for failure to define "mentally retarded" persons, and that there is insufficient evidence to support the trial court's finding that he is mentally retarded. After careful consideration of appellant's arguments and the record, we uphold the constitutionality of the statute and the finding of the trial court.

On September 25, 1980, the District Attorney of San Luis Obispo County filed a petition to commit appellant to the Department of Developmental Services. The petition incorporated several medical reports

---

[1] Except as otherwise indicated, all statutory references are to the Welfare and Institutions Code.

and requested judicial notice of all other reports in superior court action numbers 15867 and 2869; the petition also requested appointment of the public defender to represent appellant pursuant to section 6500.

On October 15, 1980, a letter was filed by Mr. James R. Teigen of the Tri-Counties Regional Center for the Developmentally Disabled in response to the trial court's request under section 6504.5. Letters from Doctors Mosman and Bramwell, appointed under section 6507 and Evidence Code section 730, were received on October 20. Appellant appeared with the public defender at the hearing on the petition on October 21, 1980, and opposed the commitment. At the hearing, counsel for appellant stipulated that appellant is a danger to others; Doctors Bramwell, Mosman and Sharpe testified on the issue of mental retardation. After hearing the evidence and arguments of counsel, the court found true beyond a reasonable doubt the allegations of the petition that appellant was a mentally retarded person and a danger to himself or others within section 6500; findings of fact and conclusions of law, and a formal order committing appellant to the Department of Developmental Services were filed.

STATEMENT OF FACTS

According to the medical reports filed with the superior court and the testimony of Doctors Bramwell, Mosman and Sharpe, Keith Clayton Krall was 23 years old at the time of the instant commitment and had been confined continuously in state hospitals since March 1971. The September 15, 1980, report of Craig C. Rath, Ph.D., staff psychologist at Patton State Hospital, provides this background information: "The patient was born 4-10-57. He was adopted in an anemic condition at age 6 months .... As an infant he fell off a counter, striking his head, with unknown results. Developmental milestones were somewhat delayed.

"At age 9 months he was sitting; at 18 months crawling; standing at 20 months; walking at age 2 years; and talking at 3 years of age. Toilet training was accomplished at 3 years of age, at which time he was described as 'very resistive.' When age 3 he was said to be hyperactive and a 'loner' who was envious of his sibling. By age 5 he was being termed hyperactive, disruptive, roaming and unresponsive.

"Although placed temporarily at Deveneux [sic] schools at age 8, by age 9 he had set two fires. A visit to a fire station and conversation with

the fire marshal terminated this behavior. Numerous behavioral problems continued. In October, 1970, he took down the pants of a five-year-old boy and beat him up. This behavior was repeated in December of 1970 with a young girl, culminating in his commitment to Camarillo State Hospital from 3-10-71 to 6-23-75. In 4/72 he was charged with inserting his finger in the vagina of a 5-year-old girl and spanking her. Hospitalization at Camarillo continued until he apparently assisted in the rape of a woman. He was transferred to Atascadero State Hospital where he resided from 6-23-75 to 7-28-79. After some four years in that secure environment he was transferred back to Camarillo State Hospital where he resided from 9-28-79 to 1-9-80. At that time it was felt he was inappropriately placed at Camarillo, due to his propensity for taking advantage of lower-functioning residents.

"Admission to Patton State Hospital was effected by transfer from Camarillo State Hospital on 1-9-80 under the provisions of Welfare and Institutions Code 6500 et seq. Since there was no open Regional Center case, he could not be housed on the units for the Developmentally Disabled and was placed in the Penal Code section of the Hospital. Behavior on the unit has been marginal since admission. He has had numerous interpersonal problems with peers, is quite litigious and has sexually exposed himself as recently as August, 1980."

Further details of appellant's prior behavior are provided in the written report of Dr. Bill E. Mosman, Ph.D., a licensed psychologist who interviewed appellant on October 10, 1980: "Keith indicates that his difficulties extend way back to approximately 3 years of age when he began having conflict with neighbor girls. He remembers arguing with one and slugging her. At age 11, he indicates that it got rather difficult for his mother to 'watch me.' 'I was a roughhouse and being verbally abusive and aggressive and physically aggressive.' He recalls experiences of playing 'sexual show and tell' about this age, but assures me that he was not violent during those events. He then goes on to tell me about girls with whom he did play sexual show and tell, and that he would be secretly angry at his mother and take his anger out on the girls. 'I would fingerbang them and beat the shit out of them and say "Mom, I hate your guts."' From age 10 to 11, he was placed at Deveraux School. During 1969, at age 12, he started molesting children and recalls 11 girls that he molested. The records indicate that he molested approximately five, but he indicates they were 11 in total. He was placed in Camarillo State Hospital for this, and during one of his leaves on pass he additionally molested two boys. Approximately at age 15, he

molested a boy and 'I almost beat the boy to death with a board.' He indicates that he has molested a total of approximately 11 girls in 1969 and prior, he additionally molested two 5-year-old boys in 1970, in 1972 he molested one boy, and while at Camarillo in 1976 he and another patient raped a mentally retarded adult female. He assures me that he just did not do the rape at that point in time because the other man was '200 pounds and I wasn't going to kick him off.' When I asked him what he felt he might have done if the fellow was 120 pounds instead of 200 pounds he said, 'I sure would have kicked his ass off.' He further indicates that he probably would have 'got some' himself at that point in time. Since then he has had homosexual experiences in the state hospital system, and recalls that during the time I saw him a year ago, he was having homosexual relationships with some of the men on the ward because 'I was scared of women.'"

As indicated in the report of Dr. Rath, appellant, first committed under section 6500 in September 1979, was initially placed at Camarillo State Hospital. Thereafter, appellant filed a petition for writ of habeas corpus requesting a less restrictive placement and, by agreement of the court, appellant and the Department of Developmental Services, appellant was transferred to Patton State Hospital in January 1980. Hospital records from both Camarillo and Patton indicate that appellant continued on many occasions to be verbally, physically and sexually assaultive.

Appellant has been the subject of psychological tests and evaluations for 18 years. Dr. Mosman noted that appellant's I.Q. has generally been in the 69 to 81 range, depending on his age and the test given. Dr. Mosman wrote: "There appears to be consistent agreement that his full-scale intelligence has been in the area of 80 to 83, that he has had some splinter skills higher than that, and certainly has had some splinter skills much lower than that."

However, there has been no "consistent agreement" regarding the proper diagnosis of appellant's mental condition, as illustrated by Dr. Rath's summary:

"8-66—Chronic Brain Syndrome with Behavioral Reaction (19.43)

"6-71—Unsocialized Aggressive Reaction of Childhood (308.4) with Borderline Mental Retardation (310.4)

"6-71—Paranoid Schizophrenia (295.30) with Organic Brain Syndrome and Mild Mental Retardation.

"4-72—Paranoid personality (301.07) with [non] Psychotic Organic Brain Syndrome and Ganser Syndrome.

"10-74—Paranoid Schizophrenia (295.30) with Organic Brain Syndrome and mental retardation.

"6-75—Paranoid Personality (301.07); Non-psychotic Organic Brain Syndrome (309.20); Pedophilia (302.20[)] and Aggressive Sexuality (302.80).

"2-76—Paranoid Personality (301.07); Non-psychotic Organic Brain Syndrome (309.20); Pedophilia (302.20); Aggressive Sexuality (302.80[)] and Chronic Undifferentiated Schizophrenia (295.90).

"1-77—Paranoid Schizophrenia (295.30) with borderline I.Q.

"12-77—Mental Retardation (789.00); Pedophilia (302.20) and Aggressive Sexuality (302.80).

"10-79—Mental Retardation, not further specified (80.008); Sexual Deviation, Pedophilia (302.20); Sexual Deviation, other (302.80)."[2]

The executive director and two staff psychologists from Patton State Hospital where appellant spent the nine months preceding the hearing concluded that appellant is not mentally retarded and recommended that he "not be considered for commitment under Section 6500 ...." According to the executive director, appellant was reviewed and tested by each of the reporting psychologists; Dr. Jay Adams indicated that she had day-to-day contact with appellant at the hospital. Dr. Rath's report provides an evaluation of appellant's status and a comprehensive discussion of the questions relating to his proper placement.

"The patient is of borderline intelligence as indicated by a series of intelligence tests dating back 18 years. His test scores are significantly

---

[2]The numbers in parentheses refer to the diagnostic classifications in previous editions of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association, a standard reference work containing a comprehensive classification and terminology of mental disorders. The first edition (DSM-I) was published in 1952, the second edition (DSM-II) in 1968, and a third edition (DSM-III) in 1980.

above the level at which he would be termed mentally retarded. Further, his social functioning in terms of independent social skills is much too high for him to be termed developmentally disabled. Academically, he has made significant progress in school such that he currently reads nearly as well as the average seventh grade student.

"The current evaluation gives no indications of a thought disorder in terms of hallucinations, delusions, flattened or dissociative affect. Speech pattern and content is average, albeit somewhat impoverished commensurate with his intellectual level. At times he is somewhat concrete and tangential, secondary to a mild degree of organic dysfunction. Content of speech is indicative of an unsocialized, immature young man with poor impulse control and a high potential for asocial acting out."

Specifically addressing the applicability of the concepts of developmental disability, dangerousness and grave disability, Dr. Rath stated: "The resident is definitely not mentally retarded. He has been incorrectly deemed so numerous times in the past. Using the criteria of the American Association on Mental Deficiency, his intellectual level is not sufficiently subaverage enough to be in even the mildly retarded range. He functions, rather, in the 'borderline' area, not qualifying as being mentally retarded. Further, a truly mentally retarded person would have significant social deficits existing concurrently with his intellectual deficits. The resident is not nearly socially deficient enough in terms of self-help skills, etc. to be termed mentally retarded. Finally, onset of mental retardation should occur before the age of 18, during the developmental period. There is no evidence the resident has experienced significant intellectual and social deficits before age 18 to the degree required to be termed 'mentally retarded.'

". . . . . . . . . . . . . . . .

"Since the resident is not mentally retarded, the only other way he could be termed developmentally disabled would be if he had infantile autism or cerebral palsy. There is no evidence he has ever had any other malady which would qualify him as 'developmentally disabled.'"

Dr. Rath further opined that appellant would not qualify for a Lanterman-Petris-Short (LPS) conservatorship in that he is neither gravely disabled nor suffering from a psychosis or severe organic brain disease. However, Dr. Rath agreed that appellant is dangerous ". . . in that there is an imminent likelihood of aggressive and sexual acting out to-

wards others. Indicators of dangerousness are numerous: history; poor impulse control; emotional liability; social withdrawal; etc. Every 'expert' evaluating Mr. Krall in the last decade has noted severe interpersonal problems and a strong tendency to act asocially."

Dr. Rath noted that Dr. Jay Adams had consulted with him and concurred in this assessment of appellant. Dr. Rath recommended against placement of appellant with developmentally disabled or LPS patients and stated, "[s]hould further offenses occur, disposition of [appellant's] case in the Criminal Justice System, rather than the Mental Health System should be seriously considered."

James R. Teigen, hospital liaison counselor for Tri-Counties Regional Center for the Developmentally Disabled, basing his report to the court entirely upon earlier evaluations and reports by others, cited neurological and other evidence of brain trauma in concluding that "some degree of developmental disability does exist." However, based on review of appellant's test scores, Mr. Teigen found that appellant had consistently fallen within the "borderline-to-dull normal range of intellectual functioning" and was therefore not mentally retarded.

The most important evidence on the question of whether appellant is mentally retarded was presented by Doctors Bramwell and Mosman, who discussed in detail the *basis* for their conclusions. Each interviewed appellant and administered tests, submitted written reports to the court and testified at the hearing.

Dr. Paul F. Bramwell, Ph.D., a licensed clinical psychologist, testified that he interviewed appellant on October 19, 1980, and administered the Wechsler Adult Intelligence Scale (WAIS). Dr. Bramwell had previously evaluated appellant in 1976. Appellant's full-scale I.Q. on both occasions was 76.

Dr. Bramwell explained that the WAIS is designed to measure the whole range of intelligence through use of different subtests. From the scores on the subtests, an aggregate score, commonly known as intelligence quotient, or I.Q., is computed. Wechsler defined intelligence as "the aggregate or global capacity of an individual to act purposefully, to think rationally, and to deal effectively with his environment."

Dr. Bramwell said that test scores are not precise: there is statistically a standard error of measurement in any test, as well as variance in

the test subject's attention and emotional state on the day of the test, and a subjective element in scoring on the Wechsler and Stanford-Binet. Dr. Bramwell said that he prefers to speak in terms of a *range* of intelligence rather than a specific score; appellant's range was between 70 and 80.

Also, I.Q. score was only one element of several that Dr. Bramwell took into consideration in reaching an opinion on whether appellant is mentally retarded.

"I think in . . . establishing what a person's psycholigical [*sic*] state is, of which mental retardation is a part, you have to see what he is doing in the world. It's not just how he might function on a test, but to see how he has adapted to the kinds of environment he has been in.

" . . . . . . . . . . . . . . . .

". . . if we look specifically at mental retardation, then the new classificatory system of the American Psychiatric Association, the so-called DSM-III, talks about there being some other elements besides an IQ score that are involved in the determination of mental retardation.

"Essentially, those are that, one, there should be a significantly subaverage general intellectual functioning. Now, that is intellectual functioning; not necessarily a score on a test.

"Secondly, there must be impairments in adaptive functioning, and they are precise in the DSM-II by defining what adaptive behavior is, and specifically they say it is the effectiveness with which an individual meets the standards of personal independence and social responsibility expected of his age and cultural group. That's the second aspect of it.

"The third involves that the onset of the condition should be below 18 years of age.

"*Now, most certainly I felt that he met all three of those criteria,* and certainly in such diagnosis DSM-III even cautions in terms of differentiating between borderline intelligence and mild mental retardation, and I think specifically it indicates that differentiating mild mental retardation from borderline intellectual functioning requires careful consideration of all available information, including psychological test scores, but not exclusively that, as far as my understanding.

"That is consistent with the stand that the American Psychiatric Association has had even in the DSM-II; that you must look at all factors." (Italics added.)

Dr. Bramwell stated in his written report that considering "the strong probability of practice effects and the standard error of measurement [,] Mr. Krall's Full Scale IQ score could easily fall slightly below 70.... [which] now falls within the intellectual range of Mild Mental Retardation." In his testimony, *Dr. Bramwell emphasized that all the records show that appellant has adapted poorly*. In Dr. Bramwell's view, appellant "... lacks substantial capacity to understand what is really going on, and he does misinterpret things, and he has little ability to control or inhibit his behavior. When he has an expectation of something, when he has a goal and someone thwarts that goal, as small as it might be, we see—and it's well documented—some sometimes very violent outbursts. Certainly highly aggressive outbursts occur." When asked why these outbursts occur, Dr. Bramwell explained: "... it is his inability to understand, which is partially intellectual, partially situational. At the moment, it could be partially culturally defined as well. I think most of it comes because he doesn't have the intellectual capacity to really understand some of the social situations he is in. That's a predominant factor.

"He also has—and I think it is a developmentally-induced problem, because he never developed his ability to inhibit or control his behaviors."

*Dr. Bramwell stated that both low test scores and records of appellant's behavior indicate that his mental condition has existed since childhood.* Although appellant's behavior has led to varying diagnoses, Dr. Bramwell found no evidence of a thought disorder and believed that appellant's personality and sexuality problems were primarily the result of a lack of intellectual capacity in the broadest sense. Appellant has presented difficulties in diagnosis and placement because he is "borderline," and at the "upper limit" of the mild mental retardation classification.

Dr. Bill Mosman testified that prior to the hearing he interviewed and tested appellant, reviewed appellant's prior scores on a WAIS test administered by Mosman approximately one year earlier, and reviewed hospital records. Dr. Mosman administered two tests, the Peabody Picture Vocabulary Test, and the Slosson Intelligence Test. On the former,

which tests understanding of language, appellant scored 91, the equivalent of a 15-year 7-month male—at the low end of normal. On the Slosson, a broader test of intelligence, appellant had an overall score of 82, at the level of a boy 13 years 2 months old, with some higher and some lower specific areas. Dr. Mosman found the correlation between the current scores and the full-scale I.Q. of 77 obtained the previous year on the Wechsler to be very close.

Nevertheless, because of the change in diagnostic criteria from the DSM-II to the DSM-III (see fn. 2, *ante*) and a clinical judgment that appellant has not fit into treatment programs with the mentally retarded, where Dr. Mosman the previous year had testified that appellant was mentally retarded by every criterion, at the October 1980 hearing, Mosman testified that appellant was not "globally" mentally retarded.[3] Dr. Mosman explained that the DSM-III lowered the ceiling I.Q. for mental retardation from 83 to 70. According to the authors of the DSM-III, the category of 71 to 84 I.Q. is no longer included within mental retardation because "... the large majority of persons with borderline intellectual functioning ... do not have significant impairment in adaptive behavior, ..." (DSM-III, Appen. C, p. 371.)[4]

Dr. Mosman said: "... according to his present I.Q. levels as they exist today, under the diagnostic criteria that we have to use today, ... Keith would not be mentally retarded, if you take one score, the composite score.

"I also tried to say, though, that in the issue of retardation, other factors have to be taken into consideration, and that, over and above that,

---

[3]Dr. Mosman stated in his written report: "... this means that since Keith's last court appearance, the profession has lowered the IQ level for the diagnostic description of retardation by 13 points. However, it needs to be indicated that all systems continue to agree that an IQ score is not the sole determining factor, but should only serve to help in making a clinical judgment of the patient's adaptive behavioral capacity. The adaptive behavior refers to 'the effectiveness with which an individual meets the standards of personal independence and social responsibility expected of his or her age and cultural group.' Scales 'have been designed to quantify adaptive behavior, but none is considered sufficiently reliable and valid to be used alone to evaluate this aspect of functioning.'"

[4]*All* reports indicate that appellant *does* have "significant impairment in adaptive behavior," a phenomenon of which the record shows the trial court was well aware. "Mental retardation is an impairment in learning capacity *and* adaptive behavior ...." (Italics added.) (*Inst. Juveniles* v. *Secretary of Public Welfare* (E.D.Pa. 1978) 459 F.Supp. 30, 48) (dis. opn. of Broderick, J.), revd. *Secy. of Pub. Welfare* v. *Institutionalized Juveniles* (1979) 442 U.S. 640 [61 L.Ed.2d 140, 99 S.Ct. 2523], quoted in *Cramer* v. *Gillermina R.* (1981) 125 Cal.App.3d 380, 387 [178 Cal.Rptr. 69].)

the I.Q. score is a composite score made of many different factors, and when you break that down, you are going to find some of his intellectual functioning is probably just above average. You are also going to find that some of his intellectual functioning and intellectual skills are significantly impaired and significantly below average and are in the retarded area.

"But if you pool them or average them or lump them together into one score, you are not going to get a retarded picture.

"The other thing I tried to indicate in the report is that *if you bypass the I.Q. score and look at his impulse control, his social adjustment, his ability to be independent, his ability to function without supervision, then he is significantly impaired, and the impairment would be in the retarded area.*" (Italics added.)

Dr. Mosman further testified that appellant is not within the normal band of adaptive behavior, and is in need of constant guidance and supervision. Appellant's social comprehension, impulse control, and judgment (as opposed to vocabulary and general functioning), are significantly substandard. Dr. Mosman scored appellant as between 60 and 70 in these areas, or approximately equivalent to the level of a 9-year-old child. Mosman was quite definite that appellant's behavioral deficiencies were a result of his low intellectual capacity in these areas. In summary, Dr. Mosman said that "globally" appellant is "... impaired but not retarded. In the latter case of the *social judgment, he is significantly retarded, and we have the scores to support that.* An I.Q. of 65 is what usually seems to be coming out of the testing the last few years along those lines. *Even in the DSM-III, that puts him in the retarded area.*

"Not only is the score there—which we don't have to pay attention to, and we shouldn't, one hundred percent—we have to look at his behavior in the hospital, his adaptive behavioral history the last year. It's in the record. I don't need to summarize it. It's time after time after time of impaired judgment, impaired impulse control, dangerousness, fighting with himself, exposing himself, ..." (Italics added.)

Dr. Richard W. Sharpe, Ph.D., a staff psychologist at Camarillo State Hospital, was called by appellant. As part of his duties at the

acute psychiatric inpatient unit in 1979, Dr. Sharpe examined appellant and administered psychological tests, including the WAIS. Appellant's overall I.Q. was 83. Dr. Sharpe indicated that the scores reported by Bramwell (76) and Mosman (77, one year earlier), were close to being within the realm of standard deviation. Dr. Sharpe did not feel that appellant was mentally retarded; at Camarillo, he was diagnosed as suffering from organic brain damage, with additional diagnoses of anti-social personality and chronic schizophrenia.

Dr. Sharpe stated that appellant needs a controlled, locked environment, but that the placement with acutely psychotic patients at Camarillo was inappropriate. Camarillo had no programs which would benefit appellant; placement with the present population of developmentally disabled patients was not appropriate because they are more impaired and appellant would be likely to take advantage of them.

*Dr. Sharpe said that in evaluating appellant he was not primarily concerned with determining intelligence;* his concern at that time was to assess appellant's dangerousness and proper placement in the hospital. Dr. Sharpe said that he agreed with Dr. Mosman that: "... there are areas in Keith's functioning in which he has some serious impairment. At the same time, it's difficult to assess how much of that is native to him, ... and how much is a result of the environment in which he has lived. There is a very high antisocial aspect to his personality, and we diagnosed him as an antisocial personality as well as having these areas of deficit, and sometimes it's difficult to ascertain the difference between the two, whether it's a native inability or whether it's something else." Dr. Sharpe said that although appellant is in need of long-term care, he "seems to fall somewhere between the cracks, as it were, in terms of what the state makes available to treat him."

The trial judge employed a beyond-a-reasonable-doubt standard,[5] and found that appellant was both dangerous and mentally retarded. The judge explained that he was considering the "definition" of mental retardation in former Welfare and Institutions Code section 6500, along with the current psychiatric diagnostic criteria, but weighting the factors of social and interpersonal functioning in accordance with his interpretation of legislative purpose.

[5]See *People v. Burnick* (1975) 14 Cal.3d 306, 332 [121 Cal.Rptr. 488, 535 P.2d 352].

## MOOTNESS

█ In a motion filed October 13, 1981, seeking dismissal as moot of the appeal and petition for writ of habeas corpus,[6] respondent alleged that appellant sought habeas corpus relief in Ventura County Superior Court and his release from Camarillo State Hospital was ordered on September 25, 1981. Respondent requested that this court take judicial notice of a minute order of the Ventura County Superior Court ordering the release. (Evid. Code, §§ 452, subd. (d), 459.) Because of appellant's release, respondent urges that the appeal "has no proper appellate objectives."

On October 30, 1981, appellant filed opposition stating several reasons why the appeal should not be dismissed as moot despite termination of this commitment. Appellant argues that the issue of the constitutionality of section 6500 is one of continuing public importance (citing *Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281 [144 Cal.Rptr. 241]) and that, because of the one-year commitment period under the statute, such commitments commonly will expire before an appeal can be heard.

It is established that an appellate court is justified in refusing to dismiss for mootness where an important issue is likely to recur yet evade review. (*So. Pac. Terminal Co. v. Int. Comm. Comm.* (1911) 219 U.S. 498, 515 [55 L.Ed. 310, 316, 31 S.Ct. 279, 283]; *In re Ballay* (D.C. Cir. 1973) 482 F.2d 648, 651.)

Appellant also alleges that he is the subject of a new commitment petition filed by the District Attorney of San Luis Obispo County under the same statute, and has attached to his opposition to the dismissal motion a declaration of counsel and a certified copy of a petition filed October 1, 1981, in San Luis Obispo County Superior Court. The declaration alleges that appellant was recommitted to Atascadero State Hospital on an ex parte order and thereafter was released to his parents' custody pending hearing on the new petition. Clearly, the issues in the appeal are of public interest and are not moot as to appellant. (See *People v. Martin* (1980) 107 Cal.App.3d 714, 717, fn. 2 [165 Cal.Rptr. 773]; *Doe v. Gallinot* (9th Cir. 1981) 657 F.2d 1017, 1021, fn. 6.)

For the above reasons we determine the merits of the appeal.

---

[6]Appellant's counsel requested to withdraw the petition for writ of habeas corpus in a letter dated August 27, 1981; we deem the petition withdrawn, and discuss only the appeal.

DISCUSSION

In a letter brief filed June 9, 1981, the Attorney General conceded that the order of commitment should be reversed on the ground that insufficient evidence of mental retardation was presented to support the commitment, but at the request of this court, respondent filed a supplemental brief addressing appellant's contention that section 6500 is unconstitutionally vague. A reviewing court is not bound by the respondent's "confession of error." (6 Witkin, Cal. Procedure (2d ed. 1971) pt. I, Appeal, § 330, pp. 4307-4308.) In *Thaler* v. *Thaler* (1932) 127 Cal. App. 28, 29 [15 P.2d 192], the court stated: "The mere fact that respondent is now willing to have the order reversed would not justify this court in rendering a judgment of reversal. A judgment or order will not be reversed unless the record shows some legal ground for reversal." (See also *Sun Insurance Co.* v. *White* (1897) 118 Cal. 468, 469 [50 P. 546].)

Section 6500 provides in part, "On and after July 1, 1971, no mentally retarded person may be committed to the State Department of Developmental Services pursuant to this article, unless he is a danger to himself or others." Appellant contends that this section is unconstitutionally vague because the term "mentally retarded" is not defined, and alleges that the trial court "created its own definition of the term . . . , found Appellant to fall within its confines and involuntarily committed Appellant." The Attorney General counters that the statute is constitutional because the challenged term has an accepted meaning in medical terminology, such as the definition in the DSM-III, discussed at trial, but argues that the trial court erroneously attempted to "invent" its own standard of mental retardation. We agree with respondent that the statute is constitutional, but do not agree that the trial court's determination was erroneous.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for reso-

lution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108-109 [33 L.Ed.2d 222, 227-228, 92 S.Ct. 2294, 2298-2299], fns. omitted.)

Recognizing that the first of these concerns logically does not apply where the statutory classification involves mental status which is not subject to voluntary avoidance (see *Boutilier* v. *Immigration Service* (1967) 387 U.S. 118, 123-124 [18 L.Ed.2d 661, 665-666, 87 S.Ct. 1563, 1566-1567]), appellant concentrates on the second aspect of the vagueness doctrine: the hazard of arbitrary enforcement. "[O]ne of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land." (*Giaccio* v. *Pennsylvania* (1966) 382 U.S. 399, 403 [15 L.Ed.2d 447, 450, 86 S.Ct. 518, 521].)

■ Appellant argues that the trial judge acted arbitrarily in refusing to be bound by the current psychiatric criteria for mental retardation, in considering the former statutory "definition," and in giving greater weight to evidence of retardation in the area of social activities and relationships. As a corollary to this argument, appellant complains that the lack of a clear standard hampered him in defending against the commitment. (See *United States* v. *Lattimore* (D.C. Cir. 1954) 215 F.2d 847, 849.)

"Civil as well as criminal statutes must be sufficiently clear as to give a fair warning of the conduct prohibited, and they must provide a standard or guide against which conduct can be uniformly judged by courts and administrative agencies." (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].) However, "'Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction can be given its language.' [Citation.] It will be upheld if its terms may be made reasonably certain by reference to other definable sources [citation]." (*American Civil Liberties Union* v. *Board of Education* (1963) 59 Cal.2d 203, 218 [28 Cal.Rptr. 700, 379 P.2d 4].) Moreover, courts have a duty to "'construe enactments to give specific content to terms that might otherwise be unconstitutionally vague.'" (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 253 [158 Cal.Rptr. 330, 599 P.2d 636].) "If feasible within bounds set by their words and purpose, statutes should be construed to preserve their constitutionality." (*Conservator-*

*ship of Hofferber* (1980) 28 Cal.3d 161, 175 [167 Cal.Rptr. 854, 616 P.2d 836].)

In finding appellant to be mentally retarded, the trial court relied in part on the "definition" in the prior statute. The pertinent portion of former section 6500 provided: "As used in this code, 'mentally retarded persons' means those persons, not psychotic, who are so mentally retarded from infancy or before reaching maturity that they are incapable of managing themselves and their affairs independently, with ordinary prudence, or of being taught to do so, and who require supervision, control, and care, for their own welfare, or for the welfare of others, or for the welfare of the community." Statutes 1970, chapter 351, section 3, page 765, added former section 6500.1, which stated: "On and after July 1, 1971, no mentally retarded person may be committed to the Department of Mental Hygiene pursuant to this article, unless he is a danger to himself or others."

In 1978, section 6500 was repealed and section 6500.1 was amended and renumbered as current section 6500 (Stats. 1978, ch. 1319, § 2, p. 4316; Assem. Bill No. 3119 (1977-1978 Reg. Sess.) Lanterman); the language describing "mentally retarded persons" in former section 6500 was eliminated. The reason for the 1978 change is explained in the Senate Committee on Judiciary Report on Assembly Bill No. 3119: "W. & I. Code Sections 6500 et seq. prescribe the procedures for the judicial commitment of a mentally retarded person who is a danger to himself or to others. By definition, 'mentally retarded persons' specifically excludes those who are psychotic.

"The Lanterman-Petris-Short Act governs the commitment for involuntary treatment of gravely disabled persons. 'Grave disability', is defined under the Act to mean mental illness and specifically excludes mental retardation.

"Thus, proponents point out, under present law there is no procedure by which a mentally retarded person who is also a psychotic may be committed.

"This bill would remove the exclusion of such a person from the commitment procedures of Sec[tion] 6500 et seq. W. & I. Code." (See also *Review of Selected 1978 California Legislation* (1979) 10 Pacific L.J. 247, 506-507.)

Although both the trial court and counsel refer to the "definition" of mentally retarded in former section 6500, closer examination reveals that the statute did not purport to define the phenomenon of mental retardation, but rather characterized the class of mentally retarded persons who might be involuntarily committed, e.g., those "who are *so mentally retarded* ... that they are incapable of managing themselves and their affairs independently, ..." (§ 6500, italics added.) This language describes a *degree* of retardation.

We conclude that the change in section 6500 does not alter the legal standard of mental retardation, but reflects the narrowing of the class of mentally retarded persons committable under the statute. This change was effected when former section 6500.1, imposing the requirement of dangerousness, was added. Thereafter, the description in section 6500 of the *class* of mentally retarded persons committable became surplusage, with the exception of the requirement that such persons be "not psychotic." We find no error in the trial judge's reference to the former section.[7]

---

[7]Reference to the statutory provisions defining developmental disabilities lends support to the trial judge's conclusion that the Legislature did not intend by dropping the "definition" of mentally retarded persons from section 6500 to alter totally the legal standard. Section 4512, subdivision (a), describes only the general characteristics of developmentally disabled persons and expressly includes mental retardation as well as other developmental handicaps. Developmentally disabled persons are eligible for a range of community-based services.

"'Developmental disability' means a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial handicap for such individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature." (Welf. & Inst. Code, § 4512, subd. (a).)

Subdivision (c) of section 4512, added by Statutes 1980, chapter 1237, urgency effective September 29, 1980, provides that for the purposes of state agencies receiving financial assistance under the federal Developmental Disabilities Assistance and Bill of Rights Act, "developmental disability" is defined under 42 United States Code Annotated section 6001 (7): "The term 'developmental disability' means a severe, chronic disability of a person which—[¶] (A) is attributable to a mental or physical impairment or combination of mental and physical impairments; [¶] (B) is manifested before the person attains age twenty-two; [¶] (C) is likely to continue indefinitely; [¶] (D) results in substantial functional limitations in three or more of the following areas of major life activity: (i) self-care, (ii) receptive and expressive language, (iii) learning, (iv) mobility, (v) self-direction, (vi) capacity for independent living, and (vii) economic self-sufficiency; and [¶] (E) reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated."

The substitution of the concept of dangerousness reflects a sensitivity to constitutional limitations on involuntary confinement of mentally handicapped persons (see *O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 572-576 [45 L.Ed.2d 396, 405-408, 95 S.Ct. 2486, 2492-2494]; *Jackson* v. *Indiana* (1972) 406 U.S. 715, 736-738 [32 L.Ed.2d 435, 449-451, 92 S.Ct. 1845, 1857-1858]), and parallels developments in the legislative treatment of the mentally ill. (See Welf. & Inst. Code, § 5001, subd. (a), expressing legislative intent "[t]o end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons, developmentally disabled persons, and persons impaired by chronic alcoholism, . . .")

■ Although mental retardation is not defined in either current or former section 6500, it does not follow that the legislation is unconstitutionally vague. "The required meaning, certainty and lack of ambiguity may appear on the face of the questioned statute or from any demonstrably established technical or common law meaning of the language in question [citation]." (*People* v. *Kirk* (1975) 49 Cal.App.3d 765, 769 [122 Cal.Rptr. 653].)

"Mental retardation" has long had a generally accepted technical meaning. "In the most widely used definition, the American Association on Mental Deficiency explains that mental retardation 'refers to significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior' and appearing in the 'developmental period.'" (Herr, *The New Clients: Legal Services for Mentally Retarded Persons* (1979) 31 Stan.L.Rev. 553, 555 [hereafter cited as Herr].) Within this general definition, there has been considerable controversy, particularly concerning the upper boundaries of the condition. (*Id.*, at pp. 555-556.) The level of "general intellectual functioning" is identified through standardized intelligence tests; the I.Q. ceiling values inherently are somewhat arbitrary. (DSM-III, *supra*, at p. 37.) Also, the experts acknowledge that performance on intelligence tests is affected by cultural variables and other factors. (Herr, *supra*, at p. 556.) These points of unavoidable uncertainty underscore the importance of the multifactor diagnostic approach under both the DSM-II and DSM-III.

Circuit Judge David L. Bazelon wrote in the preface to the *Symposium on Mentally Retarded People and the Law* (1979) 31 Stan.L.Rev. 541, 543: "If we have learned anything about mental retardation in the past decades, it is that hidden beneath that simple and single diagnostic label lies a complex range of behavioral phenomena stemming from a

variety of causes." The lack of precision is not created by the code section, and does not make the statute unconstitutional.

Recognizing the "massive curtailment of liberty" suffered by persons who are civilly committed (*Humphrey* v. *Cady* (1972) 405 U.S. 504, 509 [31 L.Ed.2d 394, 402, 92 S.Ct. 1048, 1052]), the Legislature has responded to the inherent difficulties in identifying "mental retardation" by enacting safeguards to protect the legal and human rights of those persons sought to be committed under the statute. Section 6500 provides for a *one-year* commitment of a mentally retarded person and only if such person is found to be dangerous. That commitment automatically expires at the end of the year; a new petition is subject to the same procedures as an original commitment. (§ 6500.) The statute requires that the alleged mentally retarded person be informed of his right to counsel and that counsel be appointed if the person is unable to afford counsel.

California case law has paralleled the Legislature in protecting persons coming within the operation of the statute by applying criminal due process standards to the hearing procedures. (See *People* v. *Burnick, supra,* 14 Cal.3d 306, 332.) A jury trial must be provided at the commitment hearing unless a jury is waived; the physical presence of the person is required unless a physical disability exists preventing attendance or presence is waived. (*O'Brien* v. *Superior Court* (1976) 61 Cal.App.3d 62, 68-69 [132 Cal.Rptr. 13].) The person is entitled to the application of the standard of proof beyond a reasonable doubt and a unanimous jury verdict. (*In re Hop* (1981) 29 Cal.3d 82 [171 Cal.Rptr. 721, 623 P.2d 282]; *Conservatorship of Roulet* (1979) 23 Cal.3d 219 [152 Cal.Rptr. 425, 590 P.2d 1].) Although the alleged mentally retarded person may be called as a witness, "[t]o the extent that the necessary elements of mental retardation and dangerousness may be established by evidence of criminal conduct, such evidence must, in its entirety, be elicited from sources other than the individual who is the subject of the commitment proceeding." (*Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 138 [151 Cal.Rptr. 653, 588 P.2d 793].) A person subject to the procedures of the section is entitled to a hearing as to the voluntariness of any statements made. (*Cramer* v. *Shay* (1979) 94 Cal.App. 3d 242 [156 Cal.Rptr. 303].)

The term "mental retardation" has a "demonstrably established technical meaning" (*People* v. *Martin, supra,* 107 Cal.App.3d 714, 724) which basic definition remains well recognized (see *People* v. *Kirk, su-*

*pra*, 49 Cal.App.3d 765, 769); the term is not unconstitutionally vague. Further, the major thrust of appellant's attack is answered by the fact that California commitment hearings under section 6500 have been shaped by the Legislature and case law to include full procedural safe-guards against errors in factfinding.[8]

■ Finally, we hold that the record supports the trial court's finding of mental retardation. The trial judge reviewed the reports and testimony before making his determination and the transcript reflects a serious and careful scrutiny.

There was substantial agreement among the experts consulted that appellant's behavior is subnormal, but significant disagreement existed regarding his overall intelligence. Dr. Rath, who reported that appellant was "definitely" not mentally retarded, felt that appellant functioned in the "borderline" area, and was "not nearly socially deficient enough in terms of self-help skills, etc. to be termed mentally retarded." Dr. Rath also found insufficient evidence of significant social deficits before age 18. Dr. Jay Adams, who had daily contact with appellant at Patton, concurred in this assessment.

However, appellant's I.Q. scores since 1966 on the Weschler children's and adult scales range from 67 to 83, and Doctors Mosman and Bramwell both agreed that appellant's history showed severe deficits in adaptive behavior long before age 18. They also agreed that appellant's behavioral problems are linked to his lack of intellectual capacity, but disagreed on an overall diagnosis. Dr. Sharpe testified that in some areas appellant's functioning showed "serious impairment," but concluded that appellant was not mentally retarded. Dr. Sharpe admitted that his purpose in testing appellant was not primarily to determine intelligence.

Dr. Mosman, who at the time of the hearing found appellant to be *significantly impaired* in his ability to function independently in his social adjustment and impulse control, and had the year before testified that by *every criterion* appellant was mentally retarded, testified in 1980 that appellant was not "globally" mentally retarded. The doctor's change in testimony clearly did not reflect a change in appellant, but

---

[8]The statutory scheme also provides for a placement hearing after a person is found to be mentally retarded and dangerous and mandates "the least restrictive residential placement necessary to achieve the purposes of treatment." (§ 6509.)

rather reflected a change in the ceiling I.Q. level under DSM-III. Dr. Mosman told the court: "He hasn't changed a bit; the law hasn't changed; just our definitions have changed."[9]

Dr. Bramwell, however, testified that he evaluated appellant after testing him in 1976 and again in 1980, and appellant's full scale I.Q. on both occasions was 76. I.Q. score was one of several elements that Dr. Bramwell considered in reaching his opinion that appellant is mentally retarded and that this retardation has existed since childhood; he stressed that appellant's aggressive outbursts occurred because he lacks "the intellectual capacity to . . . understand."

Appellant contends that Dr. Bramwell's opinion is insufficient to support the court's finding because it was contrary to that of other professionals and the DSM-III criteria. Appellant argues that if mental retardation is defined by reference to the term's technical medical meaning, such a definition must be responsive to advances in understanding of the phenomenon. We agree with this principle, but do not agree that the trial court was required to reject Dr. Bramwell's analysis as a departure from the approach outlined in the DSM-III.

"Significantly subaverage intellectual functioning is defined as an IQ of 70 or below on an individually administered IQ test. Since any measurement is fallible, an IQ score is generally thought to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75. *Treating the IQ with some flexibility permits the inclusion in the Mental Retardation category of individuals with IQs somewhat higher than 70 who truly need special education or other programs. It also permits exclusion from the diagnosis of those with IQs somewhat lower than 70 if the clinical judgment is that there are no significant deficits or impairment in adaptive functioning.*

"Adaptive behavior refers to the effectiveness with which an individual meets the standards of personal independence and social responsibility expected of his or her age and cultural group. There are scales designed to quantify adaptive behavior, but none is considered

[9]This parallels the reported occurrence in 1968 when "[T]he World Health Organization . . . redrew its definition of mental retardation to exclude persons formerly classified as 'borderline' retarded, and thus, at a stroke, placed 13 percent of the world's population outside the scope of services for mentally retarded persons." (Herr, *supra*, at p. 555, fns. omitted.)

sufficiently reliable and valid to be used alone to evaluate this aspect of functioning. Therefore, clinical judgment is necessary for the assessment of general adaptation, the individual's age being taken into consideration. The IQ level of 70 was chosen as the upper limit for Mental Retardation because most people with IQs below 70 are so limited in their adaptive functioning that they require special services and protection, particularly during the school-age years.

"The arbitrary IQ ceiling values are based on data indicating a positive association between intelligence (as measured by IQ score) and adaptive behavior. This association declines at the upper levels of Mild Retardation. Some individuals with an IQ near but below 70 may not have the impairment in adaptive behavior required for a diagnosis of Mental Retardation." (DSM-III, *supra*, at pp. 36-37; italics added.)

Had this been a jury trial, members of the jury would have been instructed that duly qualified experts may give their opinions on issues in controversy; that jurors may consider the qualifications and credibility of the expert, are not bound to accept an expert opinion as conclusive, and may disregard any such opinion if it is found to be unreasonable. The jurors would also be instructed that in resolving any conflict in the testimony of expert witnesses, the opinion of one expert should be weighed against that of another and the relative qualifications and credibility of the expert witnesses should be considered as well as the reasons and factual bases of the opinions. (See CALJIC No. 2.80 (4th ed. 1979).)[10] The jury would be cautioned not to decide an issue by the simple process of counting the number of witnesses who have testified on opposing sides, that "the final test is not in the relative number of witnesses, but in the relative convincing force of the evidence." (CALJIC No. 2.22.) Also the jury would be instructed that the testimony of one witness, if believed, "is sufficient for the proof of any fact." (CALJIC No. 2.27.)

These criteria to guide the trier of fact apply in this civil commitment hearing before the judge. (See also BAJI Nos. 2.01, 2.40, 2.41 (6th ed. 1977).) Plainly, as *all* reports and testimony presented were in agreement that appellant's adaptive behavior was impaired, the trial judge was impressed by that harmony of opinion and accepted this conclusion. There was no such agreement on whether appellant was "globally" mentally retarded; the trial judge was free to rely upon Dr. Bramwell's

---

[10]All CALJIC instructions are from the fourth edition (1979).

consistent testimony that appellant was mentally retarded at the time of the hearing and had been mentally retarded since childhood. (See *People* v. *Samuel* (1981) 29 Cal.3d 489, 498, 504-505 [174 Cal.Rptr. 684, 629 P.2d 485].) The judge gave a comprehensive explanation of his thought processes in making his determination; counsel may criticize his approach, but the evidence in the record supports his finding of mental retardation.

The record suggests that this young man, "in the system" since he was a boy, has not received the treatment, care and guidance the system should have provided. However, his degree of mental impairment is not determined by the unavailability of treatment programs which might enable him to take a place in society. Whether appellant is mentally retarded within section 6500 surely is determined in part by what services he *needs*, not by what services the system provides.

The order of commitment is affirmed.

Brown (G. A.), P. J., and Baca, J.,* concurred.

A petition for a rehearing was denied March 3, 1982, and appellant's petition for a hearing by the Supreme Court was denied May 20, 1982. Bird, C. J., Newman, J., and Reynoso, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.