[Civ. No. 67604. Second Dist., Div. Six. Jan. 24, 1984.]

In re KEITH CLAYTON KRALL, a Mentally Retarded Person.
THE PEOPLE, Plaintiff and Respondent, v.
KEITH CLAYTON KRALL, Defendant and Appellant.

## Counsel

Jeffrey Glenn, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

ABBE, J.—This is an appeal from an order committing appellant to Atascadero State Hospital pursuant to Welfare and Institutions Code section 6500.[1] Appellant was committed for the statutory period of one year after a unanimous jury found beyond a reasonable doubt that he was mentally retarded and dangerous.[2] Appellant's primary contention is that the trial court incorrectly instructed the jury regarding the definition of mental retardation. We agree and reverse.

Prior to the commencement of trial, the court, over appellant's objection, determined that the definition of mentally retarded it would use in the trial would be as follows: "[M]entally retarded means those persons, not psychotic, who are so mentally retarded from infancy or before reaching maturity that they are incapable of managing themselves and their affairs independently, with ordinary prudence or of being taught to do so, and who

---

[1] All further references are to the Welfare and Institutions Code unless otherwise designated.

[2] We note that the maximum one year period of confinement has expired. The case is, therefore, technically moot. We have not been asked to dismiss the appeal on these grounds. The issue addressed is one of continuing public importance, such orders will commonly expire before the appeal therefrom can be heard and thus evade review, and appellant has been subject to repeated commitments. Therefore, we decline to dismiss the appeal for mootness. (*Money* v. *Krall* (1982) 128 Cal.App.3d 378 [180 Cal.Rptr. 376]; *People* v. *Martin* (1980) 107 Cal.App.3d 714, 717, fn. 2 [165 Cal.Rptr. 773].)

require supervision, control, and care, for their own welfare, or for the welfare of others, or for the welfare of the community." This language, proposed by respondent, was taken directly from section 6500 as it read prior to its repeal in 1978. The court erred in so ruling and so instructing the jury for two reasons. First, the quoted language does not define mental retardation but rather describes the degree of 'mental retardation necessary to justify involuntary commitment. Second, this degree of mental retardation no longer justified involuntary commitment by statutory definition upon the repeal of former section 6500.

Concurrent with the repeal of the former version of section 6500, the Legislature amended and renumbered former section 6500.1 which is the present section 6500. It now provides, among other things: ". . . no mentally retarded person may be committed . . . unless he is a danger to himself or others. . . ." (§ 6500 is one of the few remaining sections authorizing involuntary civil commitment. (See, for example, §§ 5000-5400, 6550-6552; for a review of former statutes authorizing other such commitments see *In re Gary W.* (1971) 5 Cal.3d 296, 304-305 [96 Cal.Rptr. 1, 486 P.2d 1201]).)

The section both before and after its amendment did not define mental retardation but merely described the class of mentally retarded persons who could suffer the massive curtailment of liberty involved in involuntary confinement. The change in the section reflects legislative sensitivity to constitutional limitations on involuntary civil commitment similar to the development of legislation regarding treatment of the mentally ill. (See § 5000 et seq.; e.g., *Humphrey* v. *Cady* (1972) 405 U.S. 504, 509 [31 L.Ed.2d 394, 402, 92 S.Ct. 1048]; *Suzuki* v. *Yuen* (9th Cir. 1980) 617 F.2d 173; *In re Hop* (1981) 29 Cal.3d 82, 89 [171 Cal.Rptr. 721, 623 P.2d 282].)

Because section 6500 singles out the mentally retarded from all other developmentally disabled persons and permits their involuntary confinement for renewable one-year periods upon proof of mental retardation and dangerousness to self or others, a precise definition of mental retardation is needed. A definition can be derived from *Money* v. *Krall* (1982) 128 Cal.App.3d 378 [180 Cal.Rptr. 376].

In *Money* section 6500 was attacked on the ground that it was unconstitutionally vague because it failed to define mental retardation. The court there rejected the contention finding that: "'Mental retardation' has long had a generally accepted technical meaning. . . . '"refer[ing] to significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior" and appearing in the "developmental period."' [Citation.]" (*Ibid.*, at p. 397.) The appropriateness of this definition

for instructional purposes is supported by the fact that this definition is equivalent to that provided by the Legislature in the Penal Code. Penal Code section 1001.20, subdivision (a) uses nearly identical language to define "mentally retarded" for purposes of determining eligibility for diversion from misdemeanor criminal prosecution for retarded defendants. (Pen. Code, § 1001.21 et seq.) Therefore, this definition should have been used by the court.

We reject respondent's contention that the error was not prejudicial in that the trial court did eventually give the proper definition of mentally retarded at the request of the jury during its deliberations. Respondent first claims that appellant has failed to meet his burden of showing prejudice. Since a finding against appellant results in his involuntary commitment to an institution akin to that restriction of liberty following a criminal conviction and sentencing to a penal institution (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 223 [152 Cal.Rptr. 425, 590 P.2d 1]) it is incumbent upon the respondent to show that any error was harmless beyond a reasonable doubt. (*Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 139 [151 Cal.Rptr. 653, 588 P.2d 793].) The fact that the correct instruction was eventually given to the jury after deliberations had commenced does not cure the error for three reasons.

First, by refusing this instruction prior to trial the court, in effect, made irrelevant any testimony about whether defendant was in fact mentally retarded within the correct meaning. The ruling effectively foreclosed any defense that the defendant was not mentally retarded under the commonly accepted meaning.

Second, by giving the correct instruction after the trial concluded and during the deliberation of the jury the court may have confused the jury. At best the jury was faced with two separate contradictory definitions of what constituted mental retardation within the meaning of the instructions. One such "definition" was in fact not a definition although so identified.

Third, and perhaps most critical, the late giving of the instruction either permitted or mandated that the jury speculate from lay testimony whether the defendant was mentally retarded as so defined.

At the trial respondent had called only lay witnesses. The witnesses were the appellant's adoptive mother and father who had had appellant in their care, custody and control only until appellant was 12 or 13 years old. At the time of the hearing appellant was approximately 25 years old and had apparently been committed to various state institutions most of the intervening years. The other lay testimony was that of two teenage girls whose

testimony was presumably offered only on the issue of appellant's dangerousness. None of this lay testimony provided an evidentiary basis from which the jury could find the appellant mentally retarded within the meaning of the correct definition.

 To support a finding of mental retardation evidence must be adduced (1) that the alleged mentally retarded person has significantly subaverage general intellectual functioning, (2) that this functioning exists concurrently with deficits in adaptive behavior, and (3) that both of these deficits appeared in the developmental period. Each of these factors requires further explanation; none has a meaning commonly understood by people of reasonable intelligence. (See *People* v. *Martin* (1980) 107 Cal.App.3d 714, 724 [165 Cal.Rptr. 773]; *People* v. *Anderson* (1966) 64 Cal.2d 633, 639-640 [51 Cal.Rptr. 238, 414 P.2d 366].) Such factors are not proper subjects for lay opinion. (Evid. Code §§ 800, 801.)

Legislative recognition of the necessity for expert diagnosis and opinion upon a hearing to determine whether a person is mentally retarded is found in several code sections. Section 6507 allows court appointment of qualified expert witnesses; section 6504.5 requires the court to obtain a professional examination of the alleged mentally retarded person; Penal Code section 1001.22 requires referral to a regional center to determine whether a defendant is mentally retarded. Numerous other Penal Code sections require professional evaluation of persons suffering developmental disability. (Pen. Code, §§ 1367, 1370.1, 1600 et seq.) Welfare and Institutions Code section 5008, subdivision (a) defines evaluation in a manner making it clear that qualified expert opinion is necessary. The Supreme Court has recognized this necessity. "The inquiry into the degree of mental retardation and dangerousness mandated by section 6507 strongly suggests that periodically, perhaps annually, treating physicians and other witnesses must be produced in court in order to testify as to the present mental condition and potential danger from the subject, . . ." (*Cramer* v. *Tyars, supra,* 23 Cal.3d 131, 140.) Therefore, since no qualified expert testified there is no evidentiary foundation for the jury's finding of mental retardation.

The foregoing makes it unnecessary for us to rule on appellant's other contention on appeal.

The judgment is reversed.

Stone, P. J., and Gilbert, J., concurred.