[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 198 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 199 
OPINION
Christine Barrett appeals from the trial court's order for commitment under Welfare and Institutions Code section 6500, which determined, after a court trial, that she was "mentally retarded and a danger to herself and others" and on that basis committed her to the State Department *Page 200 
of Developmental Services for a period of one year.[1]
Barrett contends that she was deprived of her rights to due process and equal protection because the record does not show that the court advised her of her right to a jury trial and it reflects no express waiver of that right.
Section 6500 does not contain a statutory right to a jury trial. But it is established that such a constitutional right exists for the civil commitment of a "mentally retarded person" under this section. It has also been held that based on due process and equal protection principles, a court is required to make an advisement of the right to a jury trial when proceeding under section 6500 and if the right is waived, to obtain an express waiver on the record. We conclude that due process and equal protection do not require the court to affirmatively advise the proposed committee under section 6500 of his or her right to a jury trial and because commitment proceedings are civil in nature, the right may be waived as in civil proceedings generally by the failure to request a jury. Here, the record does not show either whether the court advised Barrett of her right to a jury trial or whether she expressly waived that right, personally or through counsel. Nor does the record show that Barrett made a jury trial request, either personally or through counsel. We accordingly conclude that on this record, Barrett's right to a jury trial was waived. And even if the court were required to and did not advise Barrett of her right to a jury trial and obtain an express waiver of that right, on this record, any such error would be harmless beyond a reasonable doubt. We accordingly affirm.
 STATEMENT OF THE CASE
I. The Petition
On January 22, 2009, the district attorney filed a petition for Barrett's commitment under section 6500 et seq. The petition alleged that Barrett was a "person mentally retarded" and was a danger to herself and others. It prayed for an evidentiary hearing and if the court were to find the allegations true, for an order that Barrett "be committed to the care and custody of the Director of Developmental Services for a period not to exceed one year so *Page 201 
that she may receive suitable care and treatment." Attached to the petition were two January 2009 reports prepared by the San Andreas Regional Center, which serves persons with developmental disabilities, one directed to the district attorney's office authored by Betty Crane, the center's service coordinator, and one directed to the trial court authored by Robert Thomas, Ph.D., a center psychologist.
Ms. Crane's report noted that Barrett was then 27 years old and was conserved by her parents. For about two years, she had been living independently in a two-bedroom condominium with live-in support. Before that, she had lived in a "Level 41 residential facility"[2] for about two years and before that, she had lived in her family home. She was participating in an adult day program. Barrett's "official diagnoses" included "Axis I: Schizoaffective, chronic impact severe," "Axis I: Atypical Pervasive Developmental Disorder, Full Syndrome, impact severe," "Premenstrual Disorder," and "Mild Mental Retardation." But her history also included diagnoses of autism and mood disorder. The report observed that Barrett's mental health "reveal[ed] deteriorating behaviors, such as being aggressive to others, increased property destruction, [and] injury to self and others." She was "obsessed with dying her hair on a daily basis and [was] upset when she [did] not like the result." She had been hospitalized twice in the preceding five months, and had begun to go "AWOL from Supported Living Staff . . ., causing her to be unsafe in the community." The report also noted that Barrett had a history of "maladaptive behavior" in response to anxiety and frustration such as "hitting, pushing, screaming, and property destruction" and that due "to her cognitive deficits, she does not have the skills necessary to cope, resorting instead to aggression and other socially unacceptable behaviors." In the previous year, she had "displayed the same behaviors, such as aggression towards staff, self-injurious behavior, and being at risk for jumping out of the van when in motion. These behaviors ha[d] limited her participation in the day program."
Crane's report included the recommendation of Barrett's treating psychiatrist, who opined that Barrett would "benefit most from a highly structured and consistent program like what is offered in a long term locked facility." This was echoed by the center's opinion stated in the report that Barrett remained a danger to herself and others and that the "most appropriate and least restrictive placement for [her] is a locked facility," the only place where she could "receive a full psychiatric medication review without endangering herself or others." *Page 202 
Robert Thomas's report to the court reiterated that "due to the combination of mental illness, autism and mental retardation," Barrett had engaged in "provocative and highly aggressive behaviors, which have resulted in her being a danger to herself and others." His report noted that Barrett's previous diagnoses had not been clear and that there had been a "question as to whether she had autism, as diagnosed by some, or [whether] she had primarily a mental illness, as diagnosed by others." But she was later diagnosed with mental retardation, making her eligible for developmental services. Although her mental retardation was "evident," "mental health and autism diagnoses continued to be recorded."
Thomas's report chronicled Barrett's early life, which had apparently included learning and social difficulties as well as psychotic symptoms, multiple psychiatric hospitalizations, use of psychiatric outpatient services, physical assaults on her mother, property destruction, and many instances of inappropriate and dangerous behaviors toward herself and residential treatment and independent support staff. He noted that although the primary diagnoses appearing in her records were autism and mental retardation, psychotic symptoms were secondary. Since becoming a client of the center in 2001, she had had "frequent episodes of mental deterioration resulting in aggression, somatic delusions and at times suicidal ideation, physical assault and or property destruction necessitating psychiatric hospitalization."
The report further noted that since living independently with support services beginning in late 2006, Barrett had required numerous hospitalizations for psychiatric care. Her treatment had become "difficult to maintain and she [had become] increasingly volatile and aggressive" requiring "crisis team intervention" on several occasions. She was being considered for "involuntary placement in a residential treatment program due to her inability to maintain her independence and live on her own because of volatile, aggressive and noncompliant behaviors associated with her psychiatric condition, poor cognitive functioning and rigid autistic behaviors." Thomas had made a site visit to Barrett's condominium and described that event, which made clear to him that her "mental state was such that she was not capable of living on her own, using appropriate judgment and taking care of herself in a rational manner."
Thomas opined that Barrett's "mental retardation has limited her understanding of the need for emotional and behavioral controls in her life, and the importance of a consistent medical routine. Aspects of her autism have limited her ability to cope with change and engage in appropriate problem-solving and conflict resolution. Her psychiatric disorder remains volatile and unstable, resulting in periods of mental decompensation under minimal stress, resulting in extreme emotional liability, physical and verbal aggression. [Her] *Page 203 
chronic situation, along with ongoing provocative and destructive behaviors has finally necessitated a need for involuntary placement for long term psychiatric care in order to assure her safety, as well as the safety of others who are involved in her care and supervision."
Pending the hearing, which was noticed for March 9, 2009, Barrett was placed in the custody of the Director of the Department of Developmental Services under section 6506 for placement and necessary treatment at a particular facility.
II. The Hearings
It appears from the record that at the hearing noticed for March 9, 2009, the matter was continued to April 8, 2009, for a two-hour hearing. The record includes the March 9, 2009 minutes that indicate in typewriting only that the matter was on calendar, the identification of the parties and their counsel, and the identification of the judge and court staff, including the court reporter. Someone has handwritten on the minutes "4-8-09, 10 am, 2 hrs." There is no indication in the minutes as to whether Barrett's right to a jury trial was discussed, or whether she was advised of the right or expressly waived it, through counsel or otherwise. There is not even an indication of whether Barrett was actually present. Although the March 9, 2009 hearing was designated in the record for inclusion in the reporter's transcript, the court reporter filed a statement that she was listed as the reporter in the matter for that day, but that "[n]o proceedings were had," which we understand to mean that no reported proceedings in the matter took place. Accordingly, we do not have the benefit of knowing what was actually said at the hearing or what led to the court's continuation of the noticed evidentiary hearing to April 8, 2009.
On April 8, 2009, the matter was called and counsel made their appearances, [3] with both sides in agreement that the matter would take two hours or less to complete. There was no mention of a jury or of Barrett's right to one before San Andreas Regional Center psychologist Robert Thomas, who both sides stipulated was qualified to testify as an expert in a section 6500 setting, was called as the People's first and only witness.
Thomas testified that he had reviewed Barrett's file and had met with her as part of a request to evaluate her for possible section 6500 commitment. *Page 204 
From his review, he concluded that Barrett was a person with mental retardation in the "moderate range," meaning with an IQ in the "50's to 40's," and that she was a danger to herself or others. He based this dangerousness assessment on her behavioral history and that she was currently placed in a psychiatric unit. He referred to several incident reports from her file documenting episodes of her violent behavior, property destruction, and aggressiveness and physical violence toward staff when living in a residential facility. He also referenced reports of her physical violence towards her parents, her noncompliance with treatment, and her "going AWOL without notification" resulting in her engaging in inappropriate, threatening, and self-destructive behavior in the community. He further referenced similar behavior when she was living independently, supported by aides. She would "become highly agitated, become physically aggressive, verbally abusive[;] she attacked [support people and] destroyed property, her own property in the apartment." Much of the personal property in her home had to be removed "just to keep her safe" so that she would not endanger herself with things such as broken glass from throwing things through the windows or electrical hazards from breaking appliances. She had attacked support people and staff approximately 20 to 30 times in the previous year and a half. She had also threatened suicide, verbalized suicidal thoughts, and engaged in self-mutilation.
Thomas further opined that because of Barrett's mental retardation, she has difficulty controlling her dangerous behavior as "she lacks the ability to understand the complexity of her disorder and the need for treatment." In his view, her dual diagnosis of mental illness and mental retardation limited the kinds of facilities that would be appropriate for her. He thought it would be very difficult in her case to "differentiate what behavior [was] attributed to what particular disorder" as the effects of autism, limited cognitive ability, and psychotic disorder were all "interacting." But based on his evaluation, he recommended that she be committed under section 6500 and placed in a specific locked psychiatric facility that also addresses mental retardation, which in his opinion was the least restrictive placement appropriate for her.
Barrett herself testified that she did not like being in the locked facility where she then was placed because she did not "have [her] freedom." Although the food was good and the staff nice, she could not go on outings and would prefer to live in a group home in San Jose. She did not believe that she was "mentally disordered."
III. The Court's Order
At the conclusion of testimony and argument, the court found that Barrett presented "a complex situation" that affected her behavior and care and *Page 205 
treatment, and that there had been a series of mental health diagnoses and labels applied to her. But based on the evidence, she was "moderately mentally retarded." Her actions, particularly over the prior year, demonstrated that she was "a danger to herself and others." The court characterized the evidence as "clear" that Barrett's "behavior and her dangerousness to both herself and to others is based upon mental retardation." Although her dangerousness might "also have an element of being based on her mental illness," it was clear to the court that both factors were involved and that this level of demonstrated causal link between mental retardation and dangerousness was sufficient to order commitment under section 6500 for up to one year. The court also found that the requested placement was the least restrictive for Barrett's needs. But the court also ordered that Barrett undergo a full diagnostic assessment to determine just what her ongoing treatment and long-term placement needs are and the court set a hearing three months later for a report on that.[4]
The court's written order, filed the day of the hearing, found Barrett to be "mentally retarded and a danger to herself and others" and ordered her committed "to the Department of Developmental Services for a period of one year commencing on April 8, 2009," under section 6500 et seq. Barrett timely appealed.
 DISCUSSION
I. The Parties' Contentions
In her opening brief, Barrett contends that she was denied a jury trial in violation of her rights to due process and equal protection. She urges not only that a person facing involuntary civil commitment under section 6500 has a constitutional right to a jury trial but also that the court has an affirmative duty to apprise the person of that right and to "obtain a valid waiver," absent which, she contends, there is structural error requiring reversal. She cites People v. Alvas (1990)221 Cal.App.3d 1459 [271 Cal.Rptr. 131] (Alvas) andPeople v. Bailie (2006) 144 Cal.App.4th 841
[50 Cal.Rptr.3d 761] (Bailie), both Third District cases, in support of this contention.
The People in essence concede that there is a right to a jury trial under section 6500 but contend that it is only on request and that the right may be waived by the failure to request a jury under Code of Civil Procedure section 631, the proceedings being civil in nature. They further contend that the *Page 206 
record is in any event inadequate here to demonstrate reversible error and moreover that any error is harmless.
II. Commitment Under Section 6500
It used to be that a person could be committed to a state hospital for an indefinite period upon a finding of mental retardation. (O'Brien v. Superior Court (1976)61 Cal.App.3d 62, 66 [132 Cal.Rptr. 13] (O'Brien).) But section 6500, initially enacted in 1970 as former section 6500.1 (Stats. 1970, ch. 351, § 3, p. 765), now provides in pertinent part that "no mentally retarded person may be committed to the State Department of Developmental Services pursuant to this article, unless he or she is a danger to himself or herself, or others. . . . [¶] . . . [¶] Any order of commitment made pursuant to this article shall expire automatically one year after the order of commitment is made." Any subsequent petitions for recommitment must follow the same procedures as the initial petition. And in any proceedings conducted under section 6500 et seq., "the alleged mentally retarded person shall be informed of his or her right to counsel by the court, and if the person does not have an attorney for the proceedings, the court shall immediately appoint the public defender or other attorney to represent him or her." (§ 6500.)
The statute provides no right to a jury trial. But inO'Brien, Division Two of the Fourth District Court of Appeal held on equal protection and impliedly on due process grounds that even though no statutory jury trial right appears in section 6500, "allegedly mentally retarded persons are entitled to jury trial upon request." (O'Brien,supra, 61 Cal.App.3d at p. 69, italics added; see alsoIn re Gary W. (1971) 5 Cal.3d 296, 303-307
[96 Cal.Rptr. 1, 486 P.2d 1201] [fundamental right to a jury trial exists in civil proceeding to extend commitment to CYA (California Youth Authority)].) The same court reiterated this holding on due process grounds in In re Watson (1979)91 Cal.App.3d 455, 459-460 [154 Cal.Rptr. 151], and further held that the person proposed to be committed also has the right to be present during the presentation of the evidence but because civil commitment proceedings are not criminal in nature, has no privilege not to testify at the hearing. (In re Watson, at pp. 459-462, citing Cramer v. Tyars (1979)23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793] (Cramer).) The Fifth District has likewise recognized, on due process grounds, the right to a jury trial on request and other rights related to procedural fairness in section 6500 proceedings inMoney v. Krall (1982) 128 Cal.App.3d 378, 398
[180 Cal.Rptr. 376].
The Third District Court of Appeal in Alvas went even further, recognizing not only a right to a jury trial in section 6500 proceedings but also holding, on equal protection and due process grounds, that the trial court has an *Page 207 
affirmative duty to advise the person proposed for commitment of the right on the record, unless it is affirmatively shown by competent evidence that the person is unable to comprehend the right. (Alvas, supra, 221 Cal.App.3d at pp. 1463-1464.)Alvas further described the jury trial right in section 6500 proceedings as "of constitutional dimension" because of the liberty interests at stake and therefore, on due process grounds, held that any waiver of the right must also be shown on the record. (Alvas, supra,221 Cal.App.3d at pp. 1464-1465; see §§ 5302-5303.) The crux of the holding was that with respect to the right to a jury trial in commitment proceedings affecting persons with mental retardation, safeguards applicable to criminal proceedings are required.
In support of its equal protection analysis, Alvas
cited the Lanterman-Petris-Short Act (LPSA), section 5000 et seq., which applies to the civil commitment of persons who suffer from mental disorders other than mental retardation (§ 5002) and who are a danger to themselves or others or are gravely disabled. The LPSA provides for 72-hour and 14-day periods of detention for treatment and evaluation. (§§ 5150, 5170, 5200, 5225, 5250.) "If further detention is required, sections 5300, 5301, and 5304 provide the procedural mechanism for commitment and recommitment periods of 180 days each. With respect to these extended commitments, the trial court is statutorily required (§ 5302) to advise the defendant of his right to a jury trial on the allegations. No similar safeguard exists for those accused of being dangerously mentally retarded." (Alvas, supra, 221 Cal.App.3d at p. 1463.) The Alvas court saw no rational basis to distinguish between mentally disordered persons subject to the LPSA and persons with mental retardation subject to section 6500. Therefore, it held that the LPSA's requirement of advisement of the right to trial by jury was likewise compelled in section 6500 proceedings. (Alvas, supra, at pp. 1463-1464.)
Some 16 years after Alvas, the Third District reaffirmed in Bailie its holding that equal protection requires that persons facing commitment under section 6500 be advised by the court of their right to a jury trial. (Bailie, supra, 144 Cal.App.4th at pp. 844-847.) But the court in Bailie stopped short of reaffirmingAlvas on due process grounds, recognizing that courts, including the United States and California Supreme Courts, have in recent years reevaluated the nature of civil commitment proceedings and the application of criminal safeguards in those proceedings, coming to "`"the conclusion that defendants in civil commitment proceedings, generally, arc not constitutionally entitled to the procedural safeguards afforded to defendants in criminal trials." [Citations.]'" (Bailie,supra, 144 Cal.App.4th at p. 847, quoting People v.Rowell (2005) 133 Cal.App.4th 447, 453 [34 Cal.Rptr.3d 843] [waiver of jury trial in SVP (sexually violent predator) commitment proceedings *Page 208 
need not be personal]; see, e.g., People v. Beeson
(2002) 99 Cal.App.4th 1393, 1405 [122 Cal.Rptr.2d 384] [acknowledging jurisprudential reevaluation of civil commitment proceedings generally]; Allen v. Illinois (1986)478 U.S. 364, 372 [92 L.Ed.2d 296, 106 S.Ct. 2988] [expressly rejecting notion that civil commitment proceedings require full panoply of rights afforded in criminal cases]; Kansas v.Hendricks (1997) 521 U.S. 346, 368-371 [138 L.Ed.2d 501,117 S.Ct. 2072] [criminal protections do not apply in civil commitment proceedings for sexual offenders so long as proceeding's purpose and effect is not punitive]; Hubbart v.Superior Court (1999) 19 Cal.4th 1138, 1170-1179
[81 Cal.Rptr.2d 492, 969 P.2d 584] [same].)
The Bailie court nevertheless concluded that it was not necessary to determine whether Alvas's due process analysis had been undermined in the interim because, in its view, Alvas's equal protection holding remained sound. (Bailie, supra, 144 Cal.App.4th at p. 847.)Bailie went on to hold, consistent with In reHoward N. (2005) 35 Cal.4th 117, 128 [24 Cal.Rptr.3d 866,106 P.3d 305] in the sexually-violent-predator civil commitment context, that in order not to violate due process, section 6500 must be applied to require proof not only of mental retardation and dangerousness but also that it is mental retardation that causes serious difficulty in controlling dangerous behavior. (Bailie, at pp. 847-851; see also People v.Sweeney (2009) 175 Cal.App.4th 210, 222-225
[95 Cal.Rptr.3d 557] [mental retardation must be substantial factor in causing serious difficulty in controlling dangerous behavior under § 6500]; but see People v. Quinn (2001)86 Cal.App.4th 1290, 1293 [103 Cal.Rptr.2d 915] [§ 6500 not unconstitutional for its requirement of proof of mental retardation and dangerousness without further proof that mental retardation is cause of dangerousness].)
Accordingly, it is clear that civil commitment under the express provisions of section 6500 requires that the person be advised of his or her right to counsel and be provided with an attorney. In addition, there remains consensus in case law that a person facing commitment under section 6500 has a right to a jury trial. Under the statute, there must be proof of both mental retardation and dangerousness to self or others. And recent cases have held that it must also be shown that the person's mental retardation is a substantial factor in his or her inability to control dangerous behavior, though this is not an issue directly raised in this case in Barrett's opening brief.[5]
With that background, we proceed to the specific questions raised here — whether under due process or equal protection principles, a court must advise a person facing commitment under section 6500 of his or her right to a jury trial and whether a waiver of the right must expressly appear in the record. *Page 209 
III. Due Process
Although the Bailie court did not reach the question whether Alvas's due process analysis remained sound, we conclude that in light of modern jurisprudence determining that defendants in a broad array of civil commitment contexts are not entitled to the full panoply of rights afforded in criminal cases, there is no entitlement to be advised of the right to trial by jury in section 6500 proceedings absent the Legislature saying so. Further, the jury trial right that we acknowledge exists in these proceedings may be waived in the manner applicable to civil cases.
The Sixth Amendment to the United States Constitution affords the right to trial by jury in all criminal prosecutions but not in civil cases. Article I, section 16 of the California Constitution provides that "[t]rial by jury is an inviolate right and shall be secured to all, but in a civil cause, three-fourths of the jury may render a verdict. A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel. In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute." (4) Thus, the right to a jury is constitutionally afforded in this state to both criminal and civil litigants. But a criminal defendant's right to a jury trial may be waived only by his or her own express consent in open court whereas a civil litigant's right may be waived as legislatively prescribed.[6] And underBoykin v. Alabama (1969) 395 U.S. 238 [23 L.Ed.2d 274,89 S.Ct. 1709] and In re Tahl (1969) 1 Cal.3d 122, 132
[81 Cal.Rptr. 577, 460 P.2d 449], a guilty plea in a criminal case is only valid if it is knowingly and voluntarily made, which must be affirmatively shown on the record with both an advisement of certain constitutional rights, including to a jury trial, and an express and personal waiver of these rights by the defendant — essentially the same standards urged here by Barrett.
Although commitment proceedings are generally civil in nature, they are nevertheless distinguished from ordinary civil actions. They are instead special proceedings because they are neither actions at law nor suits in equity. (Code Civ. Proc., §§ 22,23 [actions are ordinary proceedings by which one party prosecutes another for the declaration, enforcement, or protection of a *Page 210 
right, the redress or prevention of a wrong, or the punishment of a public offense; every other remedy is a special proceeding].) They are initiated by a petition independently of a pending action and are of a character unknown at common law. (People v. Rowell, supra, 133 Cal.App.4th at p. 451.)
Thirty years ago, the California Supreme Court noted the civil character of commitment proceedings affecting persons with mental retardation in Cramer, supra, 23 Cal.3d at page 137. As we have already observed, although such proceedings affect fundamental liberty interests, the court in that case nevertheless held that a person facing commitment in such a proceeding does not have "an absolute right, as does a defendant in a criminal action, not to be called as a witness and not to testify. [Citations.]" (Ibid.) The court described some of the features of such a proceeding that distinguish it from criminal prosecutions, including that the commitment is of limited duration, may be initiated by any interested party, is solely intended to provide for the care and treatment of persons with mental retardation who pose a danger to self and others, and may "not reasonably be deemed punishment either in its design or purpose." (Ibid.)
Thus, to acknowledge that involuntary commitment proceedings involve a liberty interest fundamental enough to implicate the right to trial by jury does not necessarily compel the conclusion that criminal prosecution standards apply, including the right to an express advisement of the right and the need for its waiver to be express. In the context of SVP commitment proceedings, for example, the Court of Appeal in Murillo v.Superior Court (2006) 143 Cal.App.4th 730, 738
[49 Cal.Rptr.3d 511], observed that "`[b]ecause civil commitment involves a significant deprivation of liberty, a defendant in [a] proceeding [under the [SVP] Act] is entitled to due process protections. [Citation.]' [Citation.] Under the Act, however, `due process . . . is not measured by the rights accorded a defendant in criminal proceedings, but by the standard applicable to civil proceedings. . . .' [Citation.] That means ` "only that the procedure adopted comport with fundamental principles of fairness and decency. The due process clause of the Fourteenth Amendment does not guarantee to the citizen of a state any particular form or method of procedure." [Citation.]' [Citation.]"
Cramer did not address the right to trial by jury in commitment proceedings affecting persons with mental retardation. But nearly all California courts that have considered that right in other civil commitment contexts have concluded that except as provided by statute, criminal safeguards do not apply. (See, e.g., Conservatorshipof Maldonado (1985) 173 Cal.App.3d 144, 147
[218 Cal.Rptr. 7961 [no express, personal waiver of jury by proposed conservatee required in LPSA conservatorship proceedings under § 5350 that could result in involuntary detention and placement]; People v. Montoya *Page 211 
(2001) 86 Cal.App.4th 825, 830-831 [103 Cal.Rptr.2d 579] (Montoya) [no personal, express waiver of jury required in MDO (mentally disordered offender) commitment proceedings under Pen. Code, § 2970]; People v. Otis (1999)70 Cal.App.4th 1174, 1176-1177 [83 Cal.Rptr.2d 326] [same];People v. Masterson (1994) 8 Cal.4th 965, 967-972
[35 Cal.Rptr.2d 679, 884 P.2d 136] (Masterson) [counsel in competency proceedings under Pen. Code, § 1367 et seq. may waive right to jury trial over defendant's objection and court need not advise of the right]; People v. Superior Court
(Howard) (1999) 70 Cal.App.4th 136, 148
[82 Cal.Rptr.2d 481] [defendant in SVPA (Sexually Violent Predators Act) proceedings under § 6600 et seq. not entitled to express, personal waiver of jury trial]; People v. Rowell,supra, 133 Cal.App.4th at pp. 451-454 [same]; People v.Powell (2004) 114 Cal.App.4th 1153, 1157-1158
[8 Cal.Rptr.3d 441] [in NGI (not guilty by reason of insanity) commitment extension proceedings under Pen. Code, § 1026.5, counsel may waive jury over defendant's objection]; Peoplev. Givan (2007) 156 Cal.App.4th 405, 409-411
[67 Cal.Rptr.3d 356] [same].) As these decisions demonstrate, that a proceeding may result in the involuntary confinement of an individual does not transform it into a criminal prosecution in which safeguards of that degree, including the need for advisement of the right to a jury trial and an express, personal waiver of that right, are required.
We acknowledge that the Court of Appeal in People v.Malins (1972) 24 Cal.App.3d 812 [101 Cal.Rptr. 270] (Malins) held that a person subject to involuntary commitment as a narcotics addict under section 3100 et seq. must personally waive a jury and that Code of Civil Procedure section 631 concerning jury waiver in civil cases does not apply. We observe that this case was decided before the more recent judicial reevaiuation of the character of civil commitment proceedings. But more fundamentally, Malins
quoted the 1971 case of In re Gary W., supra,5 Cal.3d 296 for the proposition that "`the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings. . . .'" (Malins, supra,24 Cal.App.3d at p. 820.) But In re Gary W. did not address whether a personal jury waiver is required in such proceedings. It simply held that a jury trial was required — as it was by statute under other involuntary commitment schemes — to extend CYA commitment proceedings under section 1800 et seq., even though the controlling statutes did not provide for one. (In re Gary W., supra,5 Cal.3d at pp. 305-307.) In acknowledging a person with mental retardation's right to a jury trial in section 6500 commitment proceedings, we are thus recognizing all that In re GaryW. would require. Malins also relied on In reJones (1964) 61 Cal.2d 325 [38 Cal.Rptr. 509, 392 P.2d 269] for its conclusion that a personal waiver of a jury was required in narcotics addiction commitment proceedings. But that case dealt with a "total" waiver of the procedures required for commitment — "tantamount to a plea of `guilty'" — not a mere waiver of a jury. (In re Jones, supra, at p. 330.) We therefore do not view *Page 212 Malins as persuasive authority for its holding that a personal waiver of a jury trial is constitutionally required in civil commitment proceedings.
Further, the competency of the person with alleged mental retardation is in question in section 6500 proceedings. Thus, as discussed in Montoya and Masterson, it would be anomalous to require the person to make basic decisions regarding the conduct of the proceeding, such as whether to demand a jury. If, as the California Supreme Court held inMasterson, in competency proceedings under Penal Code section 1367 et seq., counsel may waive a jury even over a defendant's objection (Masterson, supra,8 Cal.4th at pp. 971-972), then requiring an advisement and an express, personal waiver of the right to trial by jury in section 6500 proceedings would be extraordinary.
We therefore conclude that notwithstanding Alvas, the trial court was not required on due process grounds to affirmatively advise Barrett of her right to a jury trial or obtain her express waiver on the record. Moreover, the record does not demonstrate that such an advisement was not given or that a jury trial was not expressly waived.
IV. Equal Protection
As noted, both Alvas and Bailie rested on equal protection principles in their determination that the court must advise the person with alleged mental retardation of the right to trial by jury in section 6500 proceedings. Both cases drew on the LPSA's statutory requirement for a jury trial advisement (§ 5302) and found an equal protection violation as a result of different statutory treatment in this respect for commitment of those with mental disorders versus those with mental retardation.[7] This conclusion was premised on the courts finding no rational distinction between the two classes of persons with respect to involuntary commitment and no compelling reason for their disparate treatment. (Alvas,supra, 221 Cal.App.3d at pp. 1463-1464; Bailie,supra, 144 Cal.App.4th at pp. 844-847.)
As with Alvas's due process analysis, we depart from its and Bailie's equal protection holdings, concluding that persons with mental retardation on the one hand and those subject to the LPSA on the other hand are not similarly situated for purposes of a jury-trial-right advisement in commitment proceedings. And even if they were, given factual differences between these classes of persons, there is a sufficient rational basis to require a jury trial advisement in LPSA commitment proceedings but not in section 6500 proceedings. *Page 213 
Both the state and federal Constitutions provide that no person shall be deprived of equal protection of the laws. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) A person claiming an equal protection violation must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. Thus, the threshold question in any equal protection case is whether the groups are similarly situated for purposes of the law being challenged. (Cooley v. Superior Court (2002)29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654]; In re LemanuelC. (2007) 41 Cal.4th 33, 48 [58 Cal.Rptr.3d 597, 158 P.3d 148] [persons committed under state's various civil commitment statutes are not similarly situated in all respects].) (9) In cases involving disparate treatment of persons with mental retardation, "[t]o withstand equal protection review, legislation that distinguishes between the mentally retarded and others must [only] be rationally related to a legitimate governmental purpose." (Cleburne v. Cleburne Living Center,Inc. (1985) 473 U.S. 432, 446 [87 L.Ed.2d 313,105 S.Ct. 3249]; see also Marshall v. McMahon (1993)17 Cal.App.4th 1841, 1851 [22 Cal.Rptr.2d 220] [although persons with mental retardation have immutable disabilities, they are not a suspect class deserving of heightened protection for equal protection purposes].) The law in question must be accorded a "strong presumption of validity," and "`[t]he burden is on the one attacking [it] to negative every conceivable basis which might support it,' [citation]. . . ." (Heller v. Doe
(1993) 509 U.S. 312, 319, 320-321 [125 L.Ed.2d 257,113 S.Ct. 2637] (Heller).)
There is support for disparate treatment of persons with mental retardation and persons subject to the LPSA in California case law. As the People note, in Cramer v. Gillermina R.
(1981) 125 Cal.App.3d 380 [178 Cal.Rptr. 69], a group of persons with mental retardation who had been committed under section 6500 claimed they were denied equal protection because, unlike persons under the LPSA, they were not entitled to a probable cause hearing at the 72-hour point of their commitments. (Cramer v. Gillermina R., supra, at p. 386.) But the Court of Appeal rejected their claim that they were similarly situated, observing that "`there is no question that mental illness and mental retardation are separate and distinct conditions which require different treatment and/or habilitation.' [Citation.] `Mental retardation is an impairment in learning capacity and adaptive behavior. . . . Mental retardation is not an illness to be treated with drugs and therapies which have been developed for the mentally and emotionally ill.' [Citation.] The United States Supreme Court has also stressed the same factual distinction. [Citation.] The Legislature has recognized this factual distinction and created a coherent scheme for treating mental illness (§ 5150 et seq.) and a different scheme for treating mental retardation (§ 6500 et seq.). These schemes are not unconstitutional on equal protection grounds because the classifications are based on accepted *Page 214 
factual and medical differences between the mentally retarded and mentally ill." (Cramer v. Gillermina R., supra,125 Cal.App.3d at pp. 387-388, followed in People v. Quinn,supra, 86 Cal.App.4th at pp. 1294-1295.)
The court in In re Krall (1984) 151 Cal.App.3d 792,797 [199 Cal.Rptr. 911, also observed that persons with mental retardation have "significantly subaverage general intellectual functioning," a general characteristic not broadly attributed to the mentally ill and one that not only would suggest that the two classes of persons are not similarly situated with respect to being afforded a jury trial right advisement and the consequences of waiving that right but also that there is a rational basis for disparate treatment in this area.
And as also noted by the People, the United States Supreme Court in Heller articulated various differences between persons with mental illness and persons with mental retardation. In that case, the Supreme Court examined the Commonwealth of Kentucky's involuntary commitment statutes, which like California's, establish different procedures for committing those with mental retardation and those with mental disorders. In Kentucky, among other differences, the burden of proof with respect to those with mental retardation is lower (clear and convincing) than that for those with mental disorders (beyond a reasonable doubt). Although the differing procedures made it easier to commit those with mental retardation, the Supreme Court found no equal protection violation. (Heller,supra, 509 U.S. at pp. 322-330.)
Among the factual differences between the two classes of persons that the Supreme Court found relevant to its analysis were the greater difficulty in detecting and diagnosing mental illness and predicting dangerousness from it (Heller,supra, 509 U.S. at pp. 322-324) and the more intrusive medical and psychiatric treatment methods frequently imposed on the mentally ill (id. at pp. 324-325). The court further noted that as distinct from mental illness, "mental retardation is a developmental disability that becomes apparent before adulthood." (Id. at p. 321.) It "results in `deficits or impairments in adaptive functioning,' that is to say, `the person's effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group.'" (Id. at p. 329.) "`"[M]ental retardation is . . . a learning disability and training impairment rather than an illness . . ."'" and it is therefore not subject to treatment that is available to the mentally ill. (Id. at p. 325.) The court found that these differences established a rational basis for justifying disparate treatment with respect to the burden of proof required to commit. (Id. at pp. 321-328.) In doing so, the court recognized that the "`assumptions underlying these rationales [could be] erroneous, but the very fact that they are "arguable" is sufficient, on rational-basis review, to "immunize" the [legislative] choice from constitutional challenge.' [Citation.]" (Id. at p. 333.) *Page 215 
The same can be said here with respect to the statutory right in LPSA commitment proceedings to an advisement of the right to trial by jury. The noted factual differences between persons with mental retardation and persons with mental disorders or illness are sufficient to distinguish these classes of persons on this question and to rationally justify no such requirement in section 6500 proceedings. Given these differences, particularly as they relate to cognitive abilities, it is not irrational to afford mentally ill persons facing commitment more due process in the form of an affirmative advisement of the jury trial right. And Barrett offers no argument to the contrary.
We accordingly part company with the Alvas andBailie courts and conclude that the differences between the LPSA and section 6500 commitment proceedings with respect to the jury trial advisement do not violate the rights of persons with mental retardation to equal protection.
V. Reversible Error
The People contend that even if Barrett was constitutionally entitled to a jury trial advisement and to expressly and personally waive that right, on this record, any error was harmless. Barrett disputes this and contends that such error was structural, requiring reversal. The People have the better argument.
Alvas did not discuss the standard to be applied in determining whether failure to comply with its requirements should lead to reversal. But generally, reversal is automatically required only when an error is of such magnitude as to undermine the reliability of the proceeding in question, which is not the case here. (People v. Flood (1998)18 Cal.4th 470, 493 [76 Cal.Rptr.2d 180, 957 P.2d 8691.) The court in Alvas acknowledged that the failure to comply with the procedures it announced is not an error affecting the reliability of the proceeding. In determining that its holding should not apply retroactively, the court said that the rule it announced had "no bearing on the reliability of the fact-finding process." (Alvas, supra, 221 Cal.App.3d at p. 1466.) Rather, the rule merely assured "application of a procedural safeguard" and aided appellate courts in determining whether there had been a knowing and intelligent waiver of a jury trial. (Ibid.)
Even violations of established constitutional rights are not reversible per se in most cases. Failure to comply withBóykin v. Alabama, supra, 395 U.S. 238 andIn re Tahl, supra, 1 Cal.3d 122, which held a defendant pleading guilty be advised of and expressly waive his or her constitutional rights, including that of a jury trial, at one time was treated as reversible per se. But under People v.Howard (1992) 1 Cal.4th 1132, 1175 [5 Cal.Rptr.2d 268,824 P.2d 1315], such error is no longer automatically reversible if the record affirmatively *Page 216 
shows that the guilty plea was voluntary and intelligent under the totality of the circumstances. (See also People v.Allen (1999) 21 Cal.4th 424, 437-438 [87 Cal.Rptr.2d 682,981 P.2d 525].) Thus, any failure to make an advisement and obtain an express waiver in a noncriminal context should not compel reversal.
In assessing the claimed error here, which was of a constitutional rather than statutory dimension, we would conclude on this record that any error was harmless beyond a reasonable doubt. (Chapman v. California (1967)386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; People v.Hurtado (2002) 28 Cal.4th 1179, 1194 [124 Cal.Rptr.2d 186, 52 P.3d 116J [Chapman test used in civil commitment proceedings to review federal constitutional error].) There was no dispute that Barrett is a person with mental retardation. And, given her recent history, as documented in the reports attached to the petition for commitment and the testimony of Robert Thomas, there was substantial evidence that she is a danger to herself or others, even though there was no evidence that anyone, as yet, had suffered actual and serious physical injury as a result of her behavior. She regularly assaulted others and engaged in self-mutilation and suicidal ideation. And though Barrett disputes it, there was undisputed evidence, as the trial court found, that her mental retardation isa substantial factor in her inability to control her dangerous behavior. Thomas specifically opined that because of her mental retardation, she has difficulty controlling her dangerous behavior as "she lacks the ability to understand the complexity of her disorder and the need for treatment." Although he also testified that because of her dual diagnoses, it would be difficult to "differentiate what behavior [was] attributed to what particular disorder," this is not inconsistent with her mental retardation being a
substantial factor in her inability to control her dangerousness. Barrett cites no authority to the effect that a person's mental retardation must be the sole cause of dangerousness in order to be committed under section 6500 or any other civil commitment scheme.
On this record, assuming that Barrett was not advised of her right to a jury trial, there is nothing to demonstrate that had she been, she would have requested it or would not have expressly waived it. Further, on this record, it is beyond a reasonable doubt that had a jury been empanelled, the outcome of the proceeding would have been the same — a determination on undisputed evidence that the elements of section 6500 had been proven such that commitment under section 6500 was warranted. *Page 217 
 DISPOSITION
The order of commitment is affirmed.
Rushing, P. J., and Elia, J., concurred.
[1] We recognize that the term "mentally retarded person" may be offensive to some. The term is used in Welfare and Institutions Code section 6500, which is the statute providing the grounds for commitment of "mentally retarded" persons who are a danger to themselves or others. We suggest that the time may have come for the Legislature to make appropriate statutory amendments in keeping with modern and enlightened usage to avoid insensitive and offensive labeling of persons. Further statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] This category of facility has a significant staff-to-patient ratio, enough to monitor patients' "behavior on a daily basis" and to keep them "from harming" themselves.
[3] We note that the March 9, 2009 minutes state that counsel appearing for Barrett was Attorney "Ross McMahon." Although his name also appears in typewriting on the April 8, 2009 minutes, Attorney Sung Lee's name is handwritten on the document. From the reporter's transcript of the April 8, 2009 hearing, Sung Lee appears to have represented Barrett instead of Ross McMahon, though Ross McMahon's name appears on the court's written order of commitment, the proposed version of which was likely prepared by counsel for the People before the actual hearing. But Sung Lee signed the notice of appeal.
[4] The review hearing was set for July 13, 2009. We are not aware of the results of this hearing but assume that Barrett currently remains committed under section 6500 so that the appeal is not moot.
[5] The issue indirectly bears on the question of harmless error as we discuss below.
[6] Code of Civil Procedure section 631, subdivision (d) provides in pertinent part that in civil actions, a trial by jury as guaranteed in the California Constitution may be waived "(1) By failing to appear at the trial, [¶] (2) By written consent filed with the clerk or judge. [¶] (3) By oral consent, in open court, entered in the minutes. [¶] (4) By failing to announce that a jury is required, at the time the cause is first set for trial, if it is set upon notice or stipulation, or within five days after notice of setting if it is set without notice or stipulation, [¶] (5) By failing to deposit with the clerk, or judge, advance jury fees as provided in subdivision (b). [¶] (6) By failing to deposit with the clerk or judge, at the beginning of the second and each succeeding day's session, the sum provided in subdivision (c)."
[7] The LPSA does not contain a statutory requirement for an express or personal waiver of the right on the record. *Page 218