Filed 5/14/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re B.L., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.L., Defendant and Appellant. | E085039 (Super.Ct.No. J301822) OPINION |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant A.L. (Mother) challenges the sufficiency of the evidence to support the juvenile court's decision to assume dependency jurisdiction over her one-year-old daughter, Minor (Minor), after Mother's single-vehicle drunk driving accident in which the child suffered a severe brain injury. (Welf. & Inst. Code, § 300, subds. (b)(1), (e).)[1] Mother also contends the court abused its discretion in requiring monitored visitation. At the dispositional hearing, the juvenile court issued exit orders to close the dependency and transfer the matter to the family court, with sole custody vested with S.L., Minor's father (Father), which Mother does not challenge. For the reasons we explain *post*, we find no error in the juvenile court's jurisdictional finding or its monitored visitation requirement. We therefore affirm the contested rulings.

## BACKGROUND

After consuming at a party what she described as "some drinks throughout the day," Mother then drove towards a curve in the road at speeds of 65 to 70 miles an hour, as estimated by a nearby motorist. She made no apparent effort to slow down or navigate the turn in the dark. Mother drove off the roadway and struck a utility pole. She had just passed the motorist in the right lane on a two-lane city street as it became one lane. The motorist turned around and came back to the scene to find Mother attempting "to put the baby," then 10-month-old Minor, "back into the car seat" inside her vehicle.

Mother told the motorist not to summon help, directing him "not to call the police." Her stated reason was that "she did not want her child to be taken away." While

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

the motorist was on the call, Mother requested several times that he terminate it and, when he did not, she requested the phone to speak with the emergency services dispatcher. The motorist gave Mother the phone and she disconnected the call. The dispatcher called back.

An officer responded to the scene. The officer noticed Mother's bloodshot, watery eyes, her confused speech, and a "strong" odor of alcohol in her presence. She "denied having consumed any alcohol." Mother's statements attempting to describe what happened "were confusing and incoherent." She admitted to "feeling the effects of" alcohol. She failed multiple field sobriety tests.

With minor abrasions and superficial lacerations to her arms and legs, Mother was transported to Desert Valley Medical Center, along with Minor. Upon being examined there, Minor was airlifted to Loma Linda Children's Hospital. Father had been notified, and he accompanied Minor on the flight. A CT scan at the hospital revealed Minor suffered a brain bleed due to the collision.

Transported to the Hesperia police station and interviewed by police after being advised of her *Miranda* rights, Mother asserted she consumed only two beers at the party—each totaling about two ounces—for a total of four ounces. She did not drink any liquor. Earlier at the scene, she claimed she had stopped drinking alcohol more than three hours before she crashed.

Mother elected a blood draw under the implied consent law instead of a breath test for blood-alcohol content (BAC) analysis. She was arrested the same evening as the crash for cruelty to a child (Pen. Code, § 273a, subd. (a)), inflicting great bodily injury

3

while driving under the influence (Veh. Code, § 23153, subd. (a)), and on suspicion of causing great bodily injury while driving under the influence with a BAC greater than .08 percent (*ibid.*).

Acting on an immediate response referral, a social worker went to the hospital the next day. Minor was in a neck brace and crying while a nurse attended to her. Father was at her bedside to care for her. Father lived with Mother, who also cared for Father's two other children, ages six and seven years old. He had not had prior concerns about Mother's drinking, but indicated he would remove all alcohol from the home and reported, " '[T]his will never happen again.' " Mother declined to speak with the social worker, stating only that she had been at a gathering.

Three days after the accident, plaintiff and respondent San Bernardino County Children and Family Services (CFS) filed a petition alleging Minor was in need of the juvenile court's dependency protection. The juvenile court found a prima facie basis for the petition the next day at the detention hearing; Minor remained in the hospital, and mother in custody.

Minor was released to foster care on September 4, 2024, after being in the hospital for almost three weeks for her brain bleed. The accident caused "bilateral subdural hematomas and intraparenchymal hemorrhag[ing] in the corpus callosum." As a result, she had to have "a surgical procedure to relieve intracranial pressure." Her doctor reported that she responded well to treatment, with her bleeding and swelling subsiding. Minor's prognosis did not call for further special care at the time, but she would have follow-up appointments for an MRI and physical therapy.

CFS met with both Mother and Father, separately, in advance of the jurisdiction and disposition hearing. Mother's version of the accident was now that she hit a speed bump in the roadway, dislodging her water bottle, which fell under the brake pedal; she lost control of her vehicle when she reached for the bottle. According to Mother, she was knocked out briefly during the accident, regaining consciousness after the police arrived. Reminded that she had asked the motorist who stopped not to call for help, Mother said she did not remember that. Mother felt " 'horrible' that she caused her child's severe injuries that could have killed her, but it was an accident." She felt " 'lost without' her daughter."

Father no longer had contact with Mother; he "d[id] not wish her anything bad," but told the social worker he would "not allow her to harm his 'baby ever again.' " Their relationship was "over" and he had her move out. She had "always been a loving and dedicated mother," so he initially found it "hard to believe that she made the decision to drive if she was under the influence of alcohol." But "seeing his daughter suffering, having to have surgery, and be in pain and risk of dying due to [M]other's poor choices . . . made him make the decision to leave [her] and focus on caring for [Minor]."

The child's maternal grandmother reported that Mother did not have a substance abuse problem. She described the accident as "an isolated incident that unfortunately ended up causing harm to the child," but for which, in her view, Mother "does not deserve to have her child taken from her."

CFS was informed by the sheriff's department that the blood test result remained pending and could take up to eight months to process. While Father had missed an initial

5

drug test when Minor was in the hospital because he did not want to leave her side, he tested negative thereafter, and CFS had no further concerns. CFS recommended that the juvenile court remove Minor from Mother's legal custody and place her in Father's sole custody with family maintenance services, and no reunification services for Mother. The juvenile court ordered placement with Father and continued the jurisdiction and disposition hearing from early September to October, and then to November.

CFS's update for the hearing reflected that Minor was recovering well, with no impairments observed; she was crawling, standing, and holding onto furniture as she ventured towards walking. An MRI was scheduled soon, but her medical team found physical therapy unnecessary. Father was attentive to Minor, provided well for her, she was bonded to him, and he ensured her safety and continuing medical care.

Mother progressed well in her case plan requirements. The social worker reported that Mother "complied with the case plan and participated in parenting classes, individual counseling, substance abuse testing, and substance abuse counseling." Mother reported she "'learned a lot,' from the parenting education class" and "has learned to be accountable for her actions." Mother "shared that she has learned no[t] . . . to store away her feelings, and has been taking the time to really reflect, and make changes in her life and make the necessary changes to become a better person, and a better . . . mother." Mother "learned how substance abuse can 'change your life in an instant' and [that] has helped her realize 'what a beautiful life' she had with her family, and she does not want to hurt anyone that she loves again." Mother's drug and alcohol tests continued to be

negative, and her visits with Minor were positive: she engaged with Minor and was attentive to her needs.

CFS continued to recommend that sole physical and legal custody of Minor be vested with Father, removing her from Mother's custody. CFS also recommended that "[the] dependency [be] dismissed" and the matter transferred to family court, with a new case number assigned there upon the juvenile court clerk filing said custody order. (See Cal. Rules of Court, rule 5.475.)

At the combined jurisdiction and disposition hearing, the juvenile court assumed dependency jurisdiction over Minor on two grounds under section 300—under both subdivision (b) [failure to protect] and subdivision (e) [severe physical abuse]. The court explained as to the subdivision (e) basis in particular: "I do believe that the child suffered serious bodily harm as a result of Mom's severe physical abuse, and that physical abuse is, basically, the act of her getting into the car under the influence causing a car accident and [her] responsibilit[y] for that having resulted in severe injury to the child."

The court indicated that, were it to maintain jurisdiction, it would not bypass reunification services for Mother. The court praised Mother's "genuine and sincere" progress "in the predisposition services."

The court, however, determined that ongoing dependency jurisdiction was not necessary, electing instead to issue exit orders to transition the matter to family court. The court found "the arguments made by County Counsel and Minor's counsel are correct as far as the appropriate family law order." Minor's counsel summarized that following initial dependency jurisdiction to vest custody with Father, transfer would be

7

"appropriate" for the family court to supervise Mother's potential progress towards regaining custody. Minor's counsel argued, "[T]here needs to be more time for Mother to demonstrate her sobriety [because less than three months since the accident] has not been a significant period of time . . . to transition to unsupervised visits and have joint legal and joint physical custody."

Counsel for the county, like the court, acknowledged Mother's progress, including as reflected in a third-party psychological examination that Mother arranged, with positive results showing Mother "is remorseful" and had improved her "understanding" concerning how "her conduct . . . led to [Minor's] injuries." This was "consistent with what the Department saw in Mother's participation with the case plan" leading up to the hearing. Nevertheless, the deputy county counsel emphasized especially "in regards to the (e) allegation" the severity of Minor's brain injury and the gravity of Mother's choice to "put her 10-month-old child in the car with her." CFS thus sought, upon the court taking jurisdiction, a disposition vesting "sole custody to [Father] . . . and that Mother's visits are supervised." The custody ruling would then be filed in family court to open proceedings there as the initial "family law order." The court entered the order as requested ("so I'll sign that").

## DISCUSSION

Mother contends the juvenile court erred in taking dependency jurisdiction over Minor and by ordering that her visitation with Minor be monitored. The court did not err.

" ' "In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted

or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " ' " (*In re L.O.* (2021) 67 Cal.App.5th 227, 238, quoting *In re I.J.* (2013) 56 Cal.4th 766, 773.)

The juvenile court assumed dependency jurisdiction over Minor under subdivisions (b) and (e) of section 300. Subdivision (b) provides for jurisdiction when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . : [¶] (A) The failure or inability of the child's parent . . . to adequately . . . protect the child" or "(D) The inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."

Subdivision (e) separately authorizes jurisdiction when "[t]he child is under five years of age and has suffered severe physical abuse by a parent." The statute continues: "For the purposes of this subdivision, 'severe physical abuse' means any of the following: *any single act* of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death." (Italics added.)

Mother only challenges the juvenile court's jurisdictional finding under section 300, subdivision (b). She does not cite, quote, or otherwise address subdivision (e) to contest the court's decision to assume jurisdiction on that ground. This

9

omission has ramifications, as we discuss below.  As to subdivision (b), Mother argues:

"A look at three cases clearly illustrates that it takes more than a one-time incident involving alcohol to sustain jurisdiction under section 300(b)."  The three cases Mother relies on are *In re Gilberto G.* (2024) 105 Cal.App.5th 52, 63, *In re B.T.* (2011) 193 Cal.App.4th 685, 693-694, and *In re J.N.* (2010) 181 Cal.App.4th 210, 1025-1026 (*J.N.*).

Mother's summary of *J.N.*, as "perhaps the closest on point" of these cases, encapsulates her argument against jurisdiction based on a single incident.  There, as recounted by Mother, "the parents of some young children . . . went out for pizza and beer [and] had too much of the latter . . . .  On the way home, the father was driving" and, like Mother here, "he, too, ran into a utility pole.  The children were slightly injured and he (and the mother) were arrested on various charges including felony child endangerment and, for the father, felony drunk driving with a blood alcohol reading of .20."  Mother sees *J.N.* as analogous because "[b]y the time of the jurisdiction hearing, both parents had shown a strong commitment to sober living, had complete[d] alcohol education programs, [and] consistently tested negative for drugs and alcohol.  The Court of Appeal found no basis to sustain jurisdiction base[d] on this *one-time* abuse of alcohol."  (Italics added.)  Mother contends the same result is required here, including because "[t]here was some evidence" in *J.N.* "of . . . prior use of alcohol but no evidence of any prior instances of alcohol abuse."  She also adds, "Of interest to note is that the jurisdiction hearing in that case, like this one, was held about two/three months after the accident."

Mother's jurisdictional challenge fails for multiple reasons. First, Mother's failure to contest jurisdiction under section 300, subdivision (e) is fatal. Dependency "jurisdiction may rest on a single ground." (*D.M. v. Superior* Court (2009) 173 Cal.App.4th 1117, 1127 [" 'Any child who comes within *any* of the following descriptions is within the jurisdiction of the juvenile court,'" italics added]; see § 300, [¶] 1.) An appealable order is presumed correct until shown otherwise—it is the appellant's obligation to raise claims constituting reversible error. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.) Thus, absent any challenge directed at the juvenile court's jurisdictional finding under subdivision (e), it stands as an alternate, independently sufficient basis for jurisdiction.

Second, even assuming arguendo Mother intended her appellate arguments directed at section 300, subdivision (b), to also contest jurisdiction under subdivision (e), they are without merit. This is plainly so regarding her single-incident-is-not-enough contention. By its terms, section 300, subdivision (e), expressly provides for jurisdiction in "single act" instances, at least where the parent "causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death." Mother does not dispute that Minor's brain bleed met this standard. In contrast to Minor's brain trauma requiring surgery, the cases on which Mother relies to dispute single-act jurisdiction, like *J.N.*, all involved minor injuries and jurisdiction found only under subdivision (b), not (e). They are therefore inapposite.

Mother's other argument challenging jurisdiction under section 300, subdivision (b) is also unavailing when considered with respect to subdivision (e).

11

Specifically, Mother argues that her rehabilitative efforts meant dependency court protection was not necessary by the date of the jurisdictional hearing. (Citing *In re M.D.* (2023) 93 Cal.App.5th 836, 848 [" 'The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing " 'subject the Minor to the defined risk of harm' " ' "].) This principle that there must be an ongoing, present risk of harm does not aid Mother, whether directed against jurisdiction under subdivision (b) or (e).

As explained in *In re M.D.*, "the juvenile court may consider past events when determining whether a child presently needs its protection" because " '[e]vidence of past conduct may be probative of current conditions.' " (*In re M.D.*, *supra*, 93 Cal.App.5th at pp. 848-849.) " 'To establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." ' " (*Ibid.*)

Here, while Mother's progress in her case plan and continuing efforts, including securing an outside psychological evaluation, are laudable, the juvenile court could reasonably conclude more time was needed, given Mother's active efforts at concealing her child endangerment, to Minor's potentially fatal detriment. Mother likens her progress to that of the parents in *J.N.* by the jurisdiction hearing there, which was two to three months after the father's car accident while driving under the influence, a similar time frame here. (See *J.N.*, *supra*, 181 Cal.App.4th at pp. 1014-1015.)

The *J.N.* parents, however, did not start from the same depths as Mother, in terms of the severity of harm Mother caused Minor and the grossly compounded degree of risk

in her repeated actions at the scene. At the scene, she attempted to end a Good Samaritan's assistance, obtained his phone by deceit, and then terminated the call to emergency services. Time was precious for Minor with a brain bleed. The evidence indicates Mother's accident was severe, much more so than the one in *J.N.* Traveling at 65 to 70 miles per hour with her child in the car, she did not brake or turn for a curve before striking the utility pole. The juvenile court reasonably could find Mother's account of the accident lacked credibility. The evidence also showed Mother's poor judgment in driving while impaired was compounded dangerously by sustained efforts to hide her actions and prevent emergency response after a serious accident. This tendency towards secrecy posed a severe risk to Minor. Intervention and supervision were thus all the more imperative. The juvenile court could reasonably conclude jurisdiction was necessary for Mother to make sure—as Father had said—that she would never "allow her[self] to harm h[er] 'baby ever again.' " Mother echoed this objective; the juvenile court could simply and reasonably conclude that more time than just two months of court jurisdiction and supervision was a necessary safeguard.

The same evidence supporting jurisdiction supports the juvenile court's determination that monitored visitation was necessary. "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070; see *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757 [the "court may, of course, impose any . . . conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before

13

it"].)  Given, in particular, Mother's tendency towards concealment at the worst time for Minor's safety, the juvenile court did not abuse its discretion in ordering monitored visitation so soon after the accident.  Mother, of course, may seek in the family court adjustment of the restrictions on her visitation and custody, as she demonstrates sustained sobriety and insight into protecting Minor.

## DISPOSITION

The juvenile court's jurisdictional finding and monitored visitation requirement are affirmed.

CERTIFIED FOR PUBLICATION

MILLER
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

14